# United States Court of Appeals for the Federal Circuit

---

**AGILITY PUBLIC WAREHOUSING COMPANY KSCP, FKA PUBLIC WAREHOUSING COMPANY K.S.C.,**
*Appellant*

v.

**JAMES N. MATTIS, SECRETARY OF DEFENSE,**
*Appellee*

---

2016-1265

---

Appeal from the Armed Services Board of Contract Appeals in No. 56022, Administrative Judge Peter D. Ting.

---

Decided: April 4, 2017

---

JOHN PATRICK ELWOOD, Vinson & Elkins LLP, Washington, DC, argued for appellant. Also represented by BRYAN BUNTING, MICHAEL CHARNESS, ADRIANNE LISBETH GOINS, JOSHUA STEPHEN JOHNSON, RALPH MAYRELL.

PETER ANTHONY GWYNNE, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., CLAUDIA BURKE; DANIEL KARL POLING, Office of General Counsel,

Defense Logistics Agency, United States Department of Defense, Fort Belvoir, VA.

———————————

Before LOURIE, O'MALLEY, and TARANTO, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Agility Public Warehousing Co. KSCP ("Agility") appeals from a decision of the Armed Services Board of Contract Appeals ("the Board") finding that the government did not breach the terms of a supply contract with Agility. *See Pub. Warehousing Co.*, ASBCA No. 56022, 15-1 BCA ¶ 36,062. In its decision, the Board stated that it "need not decide whether the government constructively changed contract performance or whether it breached its implied duty of cooperation" because "whether the government breached the contract comes down to contract interpretation." *Id.* at 176110. The Board then interpreted the modifications to the contract and found that the government had not breached the contract. *Id.* at 176110–13. We agree with the Board that the government did not breach the express terms of the contract or a later agreement to consider exceptions, but find that the Board erred when it concluded that it "need not decide" Agility's implied duty and constructive change claims. We therefore affirm-in-part, vacate-in-part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In May 2002, the Defense Supply Center Philadelphia ("DSCP"), a sub-agency of the Defense Logistics Agency, issued a solicitation for an Indefinite-Delivery/Indefinite-Quantity commercial item type contract to provide food and non-food products to customers, including the military, in three overseas zones. *Id.* at 176092. On May 30, 2003, DSCP awarded a contract to Agility under which Agility agreed to supply "Full Line Food and Non-Food Distribution" to authorized personnel in Kuwait and

Qatar.  *Id.* at 176092–93.  The contract allowed the contracting officer to extend the contract up to four times in one-year increments.  *Id.* at 176093.

The contract's pricing structure called for a "Unit Price" that would be made up of a "Delivered Price" and a "Distribution Price" (i.e., Unit Price = Delivered Price + Distribution Price).  *Id.*  This case deals with the Distribution Price component of the pricing structure.  *Id.*  The original contract defined "Distribution Price" as "a firm fixed price, offered as a dollar amount, which represents all elements of the unit price, other than the delivered price."  *Id.*  The Distribution Price consists of various costs, including administrative expenses, overhead, profit, packaging costs, transportation costs from a vendor's distribution facility to the final delivery point, and any other projected expenses associated with the distribution function.  *Id.*

The parties modified the contract numerous times after signing it in 2003 and before signing a new Prime Vendor Contract in 2006.  For the purposes of this appeal, we provide a brief summary of the modifications and contract extensions relevant to our decision before discussing the Board's decision.

## A.  Modification 1

In June 2003, the parties agreed to Modification 1 ("Mod. 1").  *Id.*  Mod. 1 expanded the contract's service area to the Iraq deployment zone and established requirements and procedures for making deliveries in Iraq.  *See id.*  According to Mod. 1, the supply trucks going into Iraq would "travel as part of a U.S. military escorted convoy" in order to reach their various destinations.  *Id.*  Paragraph 4 of Mod. 1 provided, *inter alia*, "[t]rucks will return to [Agility] upon completion of unloading, and trucks will not be used at the sites for storage purposes."  *Id.*

## B. Modification 2

In July 2003, the parties signed Modification 2 ("Mod. 2"), which set the pricing structure for deliveries to Iraq. *Id.* at 176093–94. Mod. 2 set the price for refrigerated trucks, or "reefers," at $2,050 per truck for a three day round trip minimum, with an additional charge of $645 per truck per day for trips lasting longer than three days. *Id.* at 176094. For non-refrigerated, or "dry" trucks, Mod. 2 set the price at $1,600 per truck for a three day trip, with an additional charge of $475 per day for trips lasting longer than three days. *Id.* Mod. 2 also provided that the number of days for which the government would pay fees for each trip would be calculated based on the "time of reporting of loading until truck(s) return(s) to [Agility] distribution facility in Kuwait." *Id.* Under Mod. 2, the government did not have a limit on the maximum fees payable to Agility if trucks remained in Iraq for long periods of time. *Id.*

Mod. 2 also included a provision stating that all other contract terms and conditions not changed by Mod. 2 would remain the same. J.A. 2017. Mod. 2 did not have an integration clause.

## C. Modification 19

Agility's supply trucks delivered food in Iraq using a "hub and spoke system." *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176094. In this system, trucks travelled under military escort from Kuwait to major hubs in Iraq. *Id.* Some supply trucks then travelled from the major hubs to smaller spoke sites, such as forward operating bases. *Id.* When the supply trucks arrived at their destination, they unloaded the food at either a dining facility ("DFAC"), which hub sites typically utilized, or a mobile kitchen trailer ("MKT"), which spoke sites typically utilized. *Id.* Supply trucks that traveled to spoke sites would return to the nearest hub site after unloading food at the spoke sites. *Id.* Unloaded supply trucks at the hub

sites waited for a military convoy to return back to Kuwait. *Id.*

Within this delivery process, a variety of conditions created delays that kept the supply trucks from immediately returning to Kuwait. *Id.* at 176094–96. The chief cause for "major delays" was the lack of cold-storage equipment at some delivery locations. *Id.* The MKTs generally lacked cold-storage equipment, which meant that the soldiers at forward operating bases without refrigeration had no place to store items needing refrigeration (e.g., milk, fruits, and vegetables). *Id.* Without anywhere else to store the items needing refrigeration, the soldiers at these forward operating bases often kept the refrigerated trucks onsite to store food. *Id.*

To improve the transit time of the supply trucks, the military requested that Agility place transport liaison officers ("TLOs") at the hubs. *Id.* at 176096. Agility submitted a plan called "Operation Prime Mover," which involved deploying TLOs at five hubs to facilitate the mission "by strengthening the [Agility] transport and distribution network throughout Iraq." *Id.* On May 10, 2004, the government unilaterally issued Modification 19 ("Mod. 19") to implement a modified version of Agility's proposed Operation Prime Mover plan. *Id.* Under Mod. 19, Agility would deploy up to 25 TLOs to 8 hub sites in Iraq. *Id.* The TLOs coordinated the logistics and provided a point of contact in order to improve truck fleet and shipment visibility and improve the round trip transit time of trucks. *Id.*

## D.  Modification 27

### 1.  Conditions Leading to Modification 27

From May 17–19, 2004, Agility, DSCP, the military, and other entities held a Subsistence Prime Vendor Summit in Kuwait to "come together and work as a team . . . to help out [Agility] . . . [to] manage[] their

distribution assets." *Id.* at 176096–97. Agility's principle message at the Summit was "we need help . . . [in] getting our assets back." *Id.* at 176097.

As shown in a presentation at the Summit, DSCP data revealed that, from November 2003 to March 2004—a time period in which Mod. 2 was in effect—the average turnaround time for supply trucks was 15 days, which was greater than the 7-day turnaround time expected by the parties when they signed the contract. *Id.* at 176097. Some trips, however, greatly exceeded the average and resulted in large costs for the government under Mod. 2's fee structure. *See id.* at 176098. For example, other DSCP data showed one refrigerated truck departed Agility's facility on January 5, 2004, and did not return until June 6, 2004; under Mod. 2's fee structure, the government paid $99,445 for this 154-day trip. *Id.* Other examples resulted in the government paying $82,030; $65,905; and $63,325 for similarly-situated trucks that were held in Iraq for long periods of time. *Id.*

Another DSCP presentation at the Summit noted the government's average monthly detention costs, which were forecasted to increase. *Id.* As a potential alternative, the presentation analyzed the purchase of "adequate refrigeration storage," which potentially would reduce the government's costs and Agility's turnaround times. *Id.* As a result of the Summit, Lieutenant General Thomas Metz at the Multi-National Corps-Iraq Headquarters in Baghdad drafted a policy memorandum that set out procedures for returning Agility's trucks with less than 48 hours of delays. *Id.* The record is unclear, however, whether the policy memorandum was ever signed or issued. *Id.* The army also failed to deliver the necessary storage units in a timely manner, so "the procedures set out in the policy memorandum were not always followed." *Id.*

In August 2004, the parties began having discussions regarding an adjustment to the uncapped fees of Mod. 2. Linda Ford, a contracting officer representing the government in its negotiations and contacts with Agility, expressed concern about the amount of money being spent for the refrigerated trucks that were being kept in Iraq. *Id.* at 176098. According to Ford's testimony, the parties, when signing Mod. 2, had not anticipated that truck trips would take such a long time, resulting in the government effectively paying for the entire cost of the truck in one trip. *Id.*

To address the government's concerns, as well as its own regarding the length of time its trucks were kept out of service at certain MKTs, C.T. Switzer, Agility's General Manager and representative in communications with the government, proposed a change to Mod. 19's TLO program to improve logistics for getting trucks returned to Agility's base of operations in Kuwait. *Id.* The proposal called for sending Squad Leaders to travel with the convoys and coordinate with the TLOs, who stayed at the hubs. *Id.* To implement this change, Agility proposed a blanket increase of 58% to the distribution fee to add TLOs and Squad Leaders to the fee structure. *Id.* Ford sent back a draft modification that authorized the additional TLO numbers but, in return, proposed a cap on the number of days the government would pay transportation fees. *Id.*

Discussions between Ford and Switzer continued in regards to the cap on transportation fees. Switzer expressed reservations about the cap being "unqualified," potentially causing large losses to Agility from government-caused delays. *Id.* at 176099. He asked if Agility could "submit exceptions to the 29 day rule if the situation is unavoidable despite our best efforts to prevent it." *Id.*

Ford replied the next day with a revised draft modification. The revised modification did not remove the 29-

day cap. *Id.* Ford also did not include any reference to exceptions in the revised draft modification, but her email to Switzer stated, "exceptions to the 29 day rule will only be considered in the form of a claim." *Id.* Ford's email then asked Switzer to "sign and return the attached mod or advise if additional changes are required." *Id.* Switzer did not suggest any other changes and instead signed the modification on September 19, 2004. *Id.*

### 2. Terms of Modification 27

The terms of Modification 27 ("Mod. 27") increased the maximum number of TLOs from 25 to 94 and set a minimum number of TLOs at 81. *Id.* at 176099–100. Mod. 27 then stated that it "restructure[d] the transportation fees for the Iraq Deployment Zone to better fit the current deployment zone structure." *Id.* at 176100. The new fee structure included a minimum number of days—4, 5, or 10 days round trip for transports to southern, central, and northern Iraq, respectively—and a minimum cost for trips—$2,695–6,565 for refrigerated trucks and $2,075–$4,925 for dry trucks. *Id.* Additional days beyond the minimum trip length would continue to result in fees of $645 per day for refrigerated trucks and $475 per day for dry trucks; these were the same daily costs as those used in Mod. 2. *Id.* Mod. 27 then stated, "[t]he maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum. The maximum number of days shall apply to all [Agility] trucks that depart from Kuwait to Iraq on or after September 16, 2004." *Id.* It clarified that the fees for additional days beyond the established minimum would only apply if the delay was caused by the government, "i.e. Hub, DFAC or MKT not having the capability to off load and return the truck." *Id.*

Mod. 27 also included a provision, similar to the provisions in previous modifications, stating that, except as

provided by the terms of Mod. 27, all other contract terms and conditions would remain the same. *Id.* at 176099.

### E. Modification 36

On December 3, 2004, DSCP advised Agility that it planned to issue a contract modification to extend the contract for six months. *Id.* at 176103. Switzer's response expressed a willingness to accept the contract extension, but he stated he could not "take lightly the effects of Mod 27's limitation on the transport charges." *Id.* Switzer recognized Agility's ability to submit claims for trips exceeding the 29-day cap but acknowledged that there was "no guarantee of being paid or if paid, what delays will be involved." *Id.*

On January 13, 2005, Ford emailed Agility to ask if it would accept a modification to extend the contract for an additional 8 months. *Id.* Switzer replied that he had no problem with extending the contract, but he requested that the government rescind the 29-day cap. *Id.* On January 13, 2005, Ford rejected Switzer's request to rescind Mod. 27's 29-day cap. *Id.* at 176103–04. Ford noted, however, that the government would be open to Agility submitting an alternative proposal based on actual cost and historical truck time frames. *Id.*

Even though the government refused to rescind Mod. 27's 29-day cap, Agility agreed to Modification 36 ("Mod. 36"), a bridge contract extension, in February 2005. *See id.* at 176104. The extension covered a ten-month period from February to December 2005. *Id.* The terms of the contract, including all modifications in effect at that time, were incorporated into the bridge contract extension of Mod. 36. *Id.*

### F. Agility Files Claims for Exceptions

Based on Ford's statement to Switzer that the government would consider exceptions to the 29-day cap in the form of a claim, Agility began submitting claims for

payment to cover the trucks that were in Iraq longer than 29 days. *Id.* Agility's claims were not formal claims under the Contract Disputes Act but, rather, submissions to Ford based on her email that she would consider exceptions in the form of a "claim." *Id.* at 176104 n.8.

On February 24, 2005, Agility sent its first claim to Ford for the additional transportation fees that Agility hoped to recover for the trucks that stayed in Iraq beyond 29 days. *Id.* The claim was in the amount of $2,951,335, and Agility asserted that it covered the period from September 16, 2004, to December 31, 2004. *Id.* The contracting officer representative who received the claim was confused by the submission and requested assistance from Ford prior to paying it. *Id.* Ford explained to the representative that Agility had "no written contractual right to payment" but that Agility was submitting claims to the office based on her instruction to do so. *Id.* Ford told the representative that the claims were submitted for "review and decision." *Id.* As to this particular claim, Ford told the representative that she was not in favor of paying it because the government had already paid $8.7 million for those trucks and that she wanted more cost verification data before she would consider paying another $2.9 million. *Id.* During her testimony before the Board, Ford explained that she wanted to see the cost verification data to determine whether Agility was losing money or could show that the cap was "unreasonable, or unfair, or inequitable"; under those situations, she stated that she would have considered paying the additional fee requested. *Id.* at 176104–05.

On March 8, 2005, Agility emailed Ford to inform her that Agility would begin invoicing trucks as soon as they passed the 29 days in Iraq and that they would later send an additional claim for the time over 29 days. *Id.* at 176105. Ford rejected this proposal in an email sent on March 9, 2005. *Id.* She stated that DSCP would not accept invoices for trucks that had not returned because it

was not "part of the normal invoicing procedure." *Id.* Agility responded on March 28, 2005, by stating that the additional costs were justified because "the customer IS holding our trucks as storage. This is in direct violation of the terms of [Mod. 1], paragraph 4, which states, 'Trucks will return to [Agility] upon completion of unloading, and trucks will not be used at the sites for storage purposes.'" *Id.*

On May 25, 2005, Agility submitted a second claim. *Id.* This claim amounted to $4,161,020 and covered all Agility trucks out more than 29 days during January and February 2005. *Id.* Agility later submitted a third claim on October 26, 2005, for $1,138,370 to cover the truck trips over 29 days in March 2005. *Id.* at 176106.

On August 7, 2005, Agility contacted Ford to ask what information it needed to submit for the claims so that it could avoid sending "mountains of paperwork." *Id.* at 176105–06. Ford told Agility, "[s]end me the mountains of paperwork." *Id.* at 176106. Ford explained that all claims had to be fully supportable. *Id.* She also stated that she needed "actual cost data" to determine whether Agility's costs had actually exceeded the amount already paid for the deliveries (e.g., whether the costs from the 467 trucks involved in the original claim submission for $2.9 million had actually exceeded the $8.7 million already paid to Agility). *Id.*

Ford informed Agility on November 17, 2005, that the government intended to deny the submitted claims "for inadequate support." *Id.* She explained that the final decision would come no later than December 9, 2005, and that Agility could submit additional documentation before that date if it desired. *Id.*

On December 18, 2005, Agility informed DSCP that it would be pursuing a Request for Equitable Adjustment for the $13.1 million related to trucks being held in Iraq by the government for longer than 29 days. *Id.* On

December 20, 2005, Agility submitted a Request. *Id.* at 176107. The government initially did not respond. *Id.* On December 21, 2006, Agility submitted a certified claim seeking payment of $12,490,060 based on its previously-submitted Request. *Id.* On April 9, 2007, Ford denied Agility's claim because: (1) Mod. 27 imposed a 29-day cap; (2) Agility had failed to offer evidence to show that the amount already paid was unfair, unreasonable, or inequitable; and (3) the amount already paid was fair, reasonable, equitable, and in line with the intent of Mod. 27. *Id.* at 176108. Agility appealed the denial of the claim. *Id.* at 176108–09.

## G. The Board's Decision

After holding a ten-day hearing, the Board denied Agility's appeal in August 2015. The Board noted that it did not have any testimony from Switzer to explain why he signed Mod. 27 when he understood the 29-day cap to be unqualified.[1] *Id.* at 176101. Based on testimony from Ford, however, the Board determined that the selection of 29 days as a cap, which was double the 15-day average truck return time, suggested that both parties intended to shift the risks from the open-ended nature of Mod. 2 to the shared-risk structure of Mod. 27. *Id.* at 176101–02. The Board found that Ford "offered to leave the door open for claims in the event the 29-day cap caused [Agility] such economic hardship to the point where its ability to continue performance under the contract was threatened." *Id.* at 176102.

------

[1] Switzer did not testify during the appeal to the Board. *Id.* at 176101 n.5. The Board therefore looked to the email communications between Ford and Switzer, along with the testimony from Ford—who was "extensively cross-examined by [Agility] counsel"—to determine the meaning of Mod. 27. *Id.* at 176101.

In its decision, the Board found that Switzer's email exchanges with Ford showed Switzer "understood the consequences of establishing a cap on the transportation fee structure." *Id.* at 176099. The Board also found that "Switzer understood before he signed Mod. 27, that the 29-day cap CO Ford established was unqualified or without exception as to the causes of delay." *Id.* As to the government's informal agreement to consider exceptions in the form of a claim, the Board found that Switzer "understood that CO Ford's willingness to consider granting a claim was a matter of discretion given the right circumstances and not a matter of contract right." *Id.* at 176103.

Because Switzer did not testify, the Board determined that there was no rebuttal to Ford's statement, "made during the course of performance," that the parties "were in agreement that a transport limitation rule was absolutely necessary." *Id.* at 176103–04. The Board also found that Ford's statements to Agility "support a finding that, as far as CO Ford was concerned, 'exceptions to the 29 rule' would only be considered if it put [Agility] in an economic hardship situation." *Id.* at 176104.

In addressing Agility's arguments, the Board determined that it "need not decide whether the government constructively changed contract performance or whether it breached its implied duty of cooperation. At its core, whether the government breached the contract comes down to contract interpretation." *Id.* at 176110.

The Board held that the storage prohibition in Mod. 1, Paragraph 4, was modified by the combination of Paragraphs 2 and 3 in Mod. 27. *Id.* The Board noted that Mod. 27, Paragraph 2.e, set forth a maximum of 29 days, whereas Mod. 27, Paragraph 3, stated that "additional days beyond the established minimum fees are only applicable if the delay is customer caused." *Id.* (internal quotation marks omitted). The Board then explained that

Paragraph 3 defined customer-caused delay to mean "Hub, DFAC or MKT not having the capability to off load and return the truck." *Id.* The Board determined that Mod. 27, Paragraphs 2 and 3, when read together, modified Mod. 1, Paragraph 4, because the facts of the case made clear that "the lack of capacity to off load and return trucks were [sic] quintessentially storage-related issues." *Id.* The Board also concluded that this result was necessary because it could not harmonize Mod. 1, Paragraph 4, with Mod. 27, Paragraphs 2 and 3, under Agility's view of the contract as requiring that all trucks be returned upon unloading without being used as storage. *Id.* According to the Board, Agility's argument would leave Paragraphs 2 and 3 of Mod. 27 "useless and inexplicable." *Id.*

The Board also determined that, in signing Mod. 27, Agility agreed to be bound by its 29-day cap. *Id.* at 176111. By agreeing to consider exceptions to the 29-day cap, Ford did not abandon the cap altogether. *Id.* According to the Board, this holding was supported by its findings that Switzer understood before signing Mod. 27 that the 29-day cap was "unqualified" such that Agility was accepting all risks associated with delays beyond 29 days. *Id.* The Board also held that this understanding of the contract is further supported by the rule of contract interpretation that if "one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning." *Id.* at 176111 (collecting cases). Because the facts showed that Agility knew about Ford's understanding of the contract and Switzer did not provide any testimony to the contrary, the Board determined that Agility was bound by Ford's understanding of the contract. *Id.* at 176111–12. The Board also determined that the government's conduct supported the Board's interpretation of the contract. *Id.* at 176112–13.

## II. DISCUSSION

Agility appeals the Board's conclusions regarding its claims that the government (1) breached the express terms of the contract, (2) breached its promise to consider exceptions to Mod. 27's 29-day cap on fees, (3) breached its implied duty of good faith and fair dealing, and (4) constructively changed the contract. It does not directly challenge any of the Board's factual findings. Agility instead argues that the Board misinterpreted the contract, its relevant modifications, and the agreement to consider exceptions.

### A. Express Breach of Contract Claim

The Board's interpretation of a government contract is a question of law, reviewed de novo. *Forman v. United States*, 329 F.3d 837, 841 (Fed. Cir. 2003); *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1434 (Fed. Cir. 1992). The interpretation of a contract begins with the language of the written agreement. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *see also Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("When construing a contract, a court first examines the plain meaning of its express terms."). We consider the contract as a whole and interpret it to harmonize and give meaning to all of its parts. *Id.* "[I]n view of the Board's considerable experience and expertise in interpreting government contracts, its interpretation is given careful consideration." *Interstate Gen. Gov't Contractors*, 980 F.2d at 1434.

Agility argues that the government expressly breached the contract by using its trucks for storage purposes. Agility invokes Mod. 1, Paragraph 4, which states that Agility's trucks "will not be used at the sites for storage purposes." *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176093. According to Agility, this clause was not altered by Mod. 27 and therefore creates an actionable breach of the contract because the government did use

trucks as storage on multiple occasions. Agility contends that Mod. 27 did not affect Mod. 1, Paragraph 4, because Mod. 27 dealt only with "transportation fees" and therefore only affected non-storage delays. Agility asserts this reading would allow Paragraph 4 and Mod. 27 to exist simultaneously, which would give full meaning to all terms in the contract. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

The plain language of the modification belies Agility's argument. Paragraph 2.e. of Mod. 27 explicitly states, "[t]he maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum." *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176100. Paragraph 3 then states that the government would only pay fees for days beyond the established minimums (i.e., more than 4, 5, or 10 days, depending on the part of Iraq serviced) if "the delay is customer caused; i.e. Hub, DFAC or MKT not having the capability to off load and return the truck." *Id.* The Board found these two provisions, acting together, evidence an agreement between the parties that the government only would pay transportation fees subject to a 29-day cap. The number of days for which the government would pay fees, moreover, would accrue only if the government caused the delay, such as when a location could not offload and return a truck because of a lack of cold storage at that location. Because the language of Mod. 27, Paragraphs 2 and 3, included storage delays within the meaning of government-caused delays for transportation fees and then set a 29-day cap on the payment of transportation fees, the language of Mod. 27 abrogated any remaining significance of Mod. 1, Paragraph 4.

Because we determine that the language of Mod. 27 is not ambiguous, we need not resort to extrinsic evidence to analyze the meaning of the contract. *See Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (explaining that the parol evidence rule bars a party from

interpreting a contract with extrinsic evidence that conflicts with the language of the contract); *see also McAbee Constr. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (explaining that partially integrated contracts only allow for the introduction of extrinsic evidence to supplement a contract with additional terms consistent with the plain language of the contract); Restatement (Second) of Contracts §§ 215–16. Even if we were to consider extrinsic evidence regarding the meaning of Mod. 27, however, the evidence and the Board's unchallenged factual findings further support the Board's reading of the contract.

For example, despite the Mod. 1, Paragraph 4, requirement that the government not use the trucks for storage, some sites that lacked adequate storage capacity regularly kept supply trucks onsite to use them for storing food. *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176095–96. The average truck turnaround time for reefer trucks during the time period of Mod. 2 was between 13-24 days, but some trucks that the government used for storage stayed in Iraq for much longer, with at least two exceeding the 100-day mark. *See id.* at 176098. Under the transportation fee pricing structure of Mod. 2, the government paid for all delays caused by the use of the trucks for storage. *See id.* Some of the individual trips resulted in total payments of $99,445; $82,030; $65,905; and $63,325. *Id.*

Ford testified that the government never envisioned paying the costs it did under Mod. 2 and became unhappy with those costs. *Id.* at 176098. Ford believed a change was necessary to the fee structure because the government was "in the business of paying for deliveries" not "in the business of paying for a truck." *Id.* Ford therefore sought another modification to the contract that would share the risk between the parties of longer trips; this effort resulted in Mod. 27 and its 29-day cap on transportation fees. *See id.* at 176098–100. Ford also testified that the 29-day cap was necessary to pay for Agility's

expansion of the TLO program, which resulted in Mod. 27, Paragraph 1, increasing the maximum number of TLO team members from 25 to 94. *Id.* at 176098.

During negotiations between the parties prior to the signing of Mod. 27, Switzer emailed Ford to express "real reservations about the maximum cap being unqualified." *Id.* at 176099. Despite these reservations, the parties signed Mod. 27 with the 29-day cap in place. *Id.* at 176099–100. After the parties signed Mod. 27, Switzer sent an email to Ford and others expressing concern that there was "the makings of a problem with the new Transport Mod that limits our billing for only 29 days." *Id.* at 176102. The Board found that Switzer's "acknowledgment that Mod. 27 limited [Agility's] billing 'for only 29 days,' and that Mod. 27 'ha[d] the makings of a problem' reflected his understanding at the time that Mod. 27 provided no relief just because trucks did not return in 29 days." *Id.* Later emails from Switzer regarding the government's desire to extend the contract include statements that Agility (1) could not "take lightly the effects of Mod 27's limitation on the transport charges," and (2) requested "the 29 day transport limitation rule for Iraq be rescinded." *Id.* at 176103.

As shown by the extrinsic evidence, the government paid for trip days caused by storage delays under the fee structure of Mod. 2. The parties then replaced this fee structure with Mod. 27, which included the 29-day cap on fees. The government and Agility understood Mod. 27 imposed a 29-day cap that was "unqualified" in applying to all government-caused delays, including storage delays. The evidence therefore shows that the parties' actions under Mod. 2 and Mod. 27 amended the requirement in Mod. 1, Paragraph 4, that the government not use the trucks for storage purposes. Although Agility understandably might have wished to escape from Mod. 27 and the 29-day cap's application to storage delays upon experiencing its impact, "[a] contractor must stand by the

words of his contract." *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875).

The plain language and extrinsic evidence support the Board's interpretation that the terms of Mod. 27 replaced any remaining vitality that Mod. 1, Paragraph 4, had at the time of Mod. 27's signing. Mod. 27's imposition of a 29-day cap on all transportation fees resulted in the parties sharing the risk of travel times rather than having the government shoulder the burden alone. Because the government did not breach the contract by failing to pay for days beyond the 29-day cap, even when delays beyond the 29-day cap were caused by use of the trucks for storage, we affirm the Board's decision as to Agility's express breach of contract claim.

## B. Claims for Exceptions to Mod. 27

Although Agility agreed to the 29-day cap in Mod. 27, it claims that it did so with the understanding that it could submit exceptions to the cap if the government caused delays beyond the 29-day cap. But neither Agility nor the government ever added or insisted on language in Mod. 27 regarding exceptions to the 29-day cap. Instead, Agility bases this argument entirely on a few lines in an email exchange.

In a series of emails, Switzer expressed concerns about the 29-day cap and stated that Agility "would prefer to have the ability to submit exceptions to the 29 day rule if the situation is unavoidable despite our best efforts to prevent it." J.A. 3041. Ford's reply email does not show a direct agreement with Switzer's request; instead, Ford cites a discussion with Switzer from earlier that day and states, "exceptions to the 29 day rule will only be considered in the form of a claim." J.A. 3040. Ford then requested, "[p]lease sign and return the attached mod or advise if additional changes are required." *Id.*

According to Agility, this email chain amounts to an agreement by the government to *make* exceptions to the 29-day cap as long as Agility provided documentation to show that the government caused the delay beyond the 29 days. The plain terms of the email, however, indicate that the government merely agreed to *consider* any exceptions to the 29-day cap. The government did not agree to Agility's offered terms; it counteroffered, and Agility accepted the counteroffer when it returned a signed copy of Mod. 27 without additional changes. *See* Restatement (Second) of Contracts § 59 (Am. Law Inst. 1981). The agreement to consider exceptions is not inconsistent with the clear intent of the 29-day cap to share the risk of delays; indeed, it would be entirely inconsistent for Ford to agree in a single line in an email to grant every exception submitted by Agility for delays caused by the government after she insisted on the 29-day cap for fees and rejected Agility's attempts to lift the cap.

Mod. 27, moreover, specifically states that "[t]he 'additional days beyond the established minimum' fees are *only applicable if the delay is customer caused.*" *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176100 (emphasis added). Agility argues that the government would have to pay for any government-caused delays beyond the 29-day cap, but the government, under Mod. 27, already had to cause the delays for Agility to receive any fees beyond those laid out for minimum trips. Agility's reading of the email agreement would eviscerate the 29-day cap and ignore the government's purpose in implementing the cap. Agility agreed to the 29-day cap for fees, and it cannot escape that clause now by having the exception swallow the rule.

The Board's uncontested factual findings further support this result. The Board found that Ford considered the 29-day cap, which was "about twice the average 15-day truck return time experienced at the time" to be "more than generous." *Id.* at 176101–02. The Board also

found that Ford "offered to leave the door open for claims in the event the 29-day cap caused [Agility] such economic hardship to the point where its ability to continue performance under the contract was threatened." *Id.* at 176102. The Board further found that "Mod. 27 provided no relief just because trucks did not return in 29 days," *id.*, and "Switzer understood that CO Ford's willingness to consider granting a claim was a matter of discretion given the right circumstances and not a matter of contract right," *id.* at 176103. Switzer's own email even recognized that Agility had "no guarantee of being paid" when submitting a claim. *Id.*

Given these uncontested factual findings and the plain meaning of Ford's email, the government only agreed to *consider* claims submitted by Agility for exceptions to the 29-day cap. As discussed by the Board, the government accepted the claims filed by Agility, considered the claims, and then denied the claims for failing to meet the requirements under which the government would grant an exception. *See id.* at 176105–06, 176112–13. Finding no error in the Board's judgment on this issue, we affirm the Board's denial of Agility's claims relating to exceptions to the 29-day cap. But Ford's recognition that some relief beyond the 29-day cap might be appropriate is not irrelevant. As discussed below, it relates to the parties' obligations to carry out their own contractual duties in good faith.

## C. Implied Duty Claim

An implied duty of good faith and fair dealing exists in government contracts and applies to the government just as it does to private parties. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The duty to cooperate is an aspect of the implied duty of good faith and fair dealing. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010).

The Board's decision contains no reasoning specific to the implied duty claim. Instead, the Board stated that it "need not decide whether the government . . . breached its implied duty of cooperation. At its core, whether the government breached the contract comes down to contract interpretation." *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176110. Agility argues that the Board erred in treating the implied duty claim as being subsumed within an analysis of the express terms of the contract. According to Agility, the Board's failure to address the implied duty claim leaves fact-intensive questions unanswered, such as whether the government had an implied duty to cooperate in returning Agility's trucks or failed to cooperate by not diligently obtaining storage. Agility also asserts that the proper damages measure for a potential breach of an implied duty by the government should not be tied solely to the contract's specified transportation fee.

The government attempts to save the Board's failure to address the merits of the implied duty claim by arguing that the Board's existing analysis suffices. The government argues that it acted in conformance with the requirements of the contract because Mod. 27 covered any delay, including those caused by a lack of storage facilities, in excess of 29 days.

It is true that a party to a contract cannot use an implied duty of good faith and fair dealing to "expand [another] party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). But a "breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract." *Id.* at 994. A party might breach this implied duty by interfering with another party's performance or acting in such a way as to destroy the reasonable expectations of the other party regarding the benefits provided by the contract. *Centex*, 395 F.3d at 1304; *see also* Restatement

(Second) of Contracts § 205 cmt. d (identifying possible breaches of the implied duty of good faith and fair dealing as including "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

As addressed above, the government abided by the express terms of the contract under Mod. 27. But the government may have breached its implied duty of good faith and fair dealing by, *inter alia*, interfering with Agility's ability to perform its duties under the contract by unnecessarily delaying the return of Agility's trucks and not increasing its on-site food storage capabilities. *See Centex*, 395 F.3d at 1304; Restatement (Second) of Contracts § 205 cmt. d. In other words, if the government simultaneously imposed a cap and engaged in conduct that made it impossible for Agility to perform within that cap, the government may have breached its implied duties to Agility. Indeed, Ford's acknowledgment that circumstances might warrant payments above and beyond the 29-day cap appears to be a tacit recognition of this possibility. And the parties' discussions at the Summit leading up to Mod. 27 reflected both the government's cost concerns and Agility's need for the government's assistance in assuring the timely return of its trucks. The Board therefore erred in concluding that it "need not decide" this issue based on its interpretation of the terms of the contract.

Because the Board erred by failing to analyze the implied duty claim, we vacate the Board's decision as to that claim. We provide no opinion as to the merits of Agility's claim; the Board shall consider in the first instance whether Agility has proven that the government breached its implied duty of good faith and fair dealing. If appropriate, the Board also can consider in the first instance whether Agility has provided evidence to support a dam-

ages theory separate from the contract's specified transportation fee.

## D. Constructive Change Claim

The government constructively changes a contract to which it is a party when "a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). To demonstrate that the government has constructively changed the terms of a contract, "a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

The Board's treatment of the constructive change claim suffers from the same shortcomings as its treatment of the implied duty claim: the Board similarly concluded that it "need not address" the constructive change claim based on its interpretation of the contract. *Pub. Warehousing Co.*, 15-1 BCA ¶ 36,062, 176110. The government argues that the Board's analysis as to Mod. 27 shows that the government did not constructively change the contract. But Agility contends that the government constructively changed the contract by increasing, rather than decreasing, those instances where Agility's trucks were forced to stay on site to provide storage for the MKTs. The Board never addressed this contention, concluding, again, that "whether the government *breached* the contract comes down to contract interpretation." *Id.* (emphasis added). A change of a contract by the government, however, may or may not constitute a breach of contract, depending on the circumstances. This is so even when there is no express breach of the contract terms. *See Bell/Heery*, 739 F.3d at 1335 (distinguishing between constructive changes and cardinal changes by noting that,

among other things, a cardinal change "amounts to an actual breach of contract"). The Board, by its own admission, did not address the constructive change claim.

The government again tries to save the Board's failure to address the constructive change claim by arguing that the Board's analysis regarding the interpretation of the contract applies with equal force to the constructive change claim. But, "on the basis of the Board's opinion in this case, we cannot determine whether it properly rejected" the constructive change claim because it failed to provide any analysis of the claim. *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1060 (Fed. Cir. 2001) (vacating an Armed Services Board of Contract Appeals decision because the opinion failed to address an issue adequately); *see also Heyl & Patterson, Inc. v. O'Keefe*, 986 F.2d 480, 484 (Fed. Cir. 1993) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)) (determining that the court "would be without authority to affirm" on a basis not addressed by the Board because the Board's decisions must be upheld, if at all, on the basis articulated by the Board), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).

Because the Board did not address Agility's constructive change claim, we vacate the Board's decision as to that claim without expressing any opinion as to its merits. On remand, the Board should consider in the first instance whether the government constructively changed the contract.

## III. CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed in part, vacated in part, and remanded for further proceedings.

## AFFIRMED IN PART, VACATED IN PART, AND REMANDED

COSTS

No costs.