# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Cooper/Ports America, LLC | ) | ASBCA Nos. 61349, 61350 |
| | ) | |
| Under Contract No. HTC711-15-D-R036 | ) | |

APPEARANCES FOR THE APPELLANT:     W. Barron A. Avery, Esq.
 William T. DeVinney, Esq.
 William B. O'Reilly, Esq.
 Katherine L. McKnight, Esq.
  Baker & Hostetler LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Jeffrey P. Hildebrant, Esq.
  Air Force Deputy Chief Trial Attorney
 Lt Col Sondra Bell Nensala, USAF
 Caryl A. Potter III, Esq.
 Danielle A. Runyan, Esq.
 Lawrence M. Anderson, Esq.
  Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE SWEET
## ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

These appeals involve a contract between the government and appellant
Cooper/Ports America, LLC (C/PA) to provide stevedoring services. The government
originally entered into the contract with Shippers Stevedoring Co. (Shippers).
However, C/PA purchased Shippers' interests in the contract, and entered into a
novation agreement with the government. The complaint in ASBCA No. 61349
alleges two counts. Count One alleges that C/PA relied upon government
misrepresentations that it would renegotiate the contract's prices when it entered into
the asset purchase and novation agreements. Count Two alleges that the government's
misrepresentation breached the covenant of good faith and fair dealing. The complaint
in ASBCA No. 61350 also alleges that the government's subsequent failure to
renegotiate the contract's prices breached the covenant of good faith and fair dealing.

The government has moved for summary judgment in both appeals, arguing
that it is entitled to judgment as a matter of law because there are no genuine disputes

suggesting a misrepresentation or breach of the covenant of good faith and fair dealing. C/PA opposes that motion on the grounds that it has raised genuine disputes.[1]

For the reasons discussed below, there is a genuine dispute as to whether the government made a misrepresentation. However, C/PA cannot genuinely dispute that the government complied with the covenant of good faith and fair dealing. Therefore, we grant the government's motion for summary judgment in part. We strike Count Two of ASBCA No. 61349, and deny the appeal in ASBCA No. 61350. Otherwise, we deny the government's motion for summary judgment.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On January 28, 2015, the United States Transportation Command (government) awarded Contract No. HTC711-15-D-R036 (036 contract) to Shippers to provide stevedoring and related terminal services at ports in the Southeast United States (R4, tabs 1, 4).[2]

2. Christopher Smith[3] declares that Shippers sustained significant losses on the 036 contract because the contract prices were insufficient to cover Shippers' costs (app. resp., ex. B ¶ 4). According to Mr. Smith, sometime prior to March 2016, C/PA began exploring the possibility of acquiring Shippers, including its interests in the 036 contract (*id.* ¶ 3).

3. Mr. Smith declares that, at a conference in May 2016, he discussed the possibility of C/PA acquiring Shippers with William Fugate, a contracting officer (CO) (May conversation) (app. resp., ex. D). According to Mr. Smith, he:

> [S]pecifically expressed [his] concerns that the financial
> terms of the [036] Contract were unsustainable and said to
> [Mr. Fugate], "the reason Shippers was for sale was they
> were going to go bankrupt because of the military
> contracts...if we acquired them it could crush us too.

---

[1] C/PA also has moved for leave to file a sur-reply. Because the government raised new arguments in its reply, we grant that motion.

[2] Unless otherwise indicated, all citations to the Rule 4 file are to the Rule 4 file in ASBCA No. 61349.

[3] From December 2010, through December 2016, Mr. Smith was Senior Vice President, Network Development, at Ports America Management, Inc., which became a co-owner of C/PA. He served on C/PA's Board of Directors. (App. resp., ex. B ¶¶ 1-2)

(App. resp., ex. B ¶¶ 5-6) Mr. Smith declares that Mr. Fugate responded that, "[t]he Government is not in the business of putting companies out of business, you would have to novate the contract then file a claim and we would work with you" (*id.* ¶ 7). Mr. Smith interpreted that as an assurance that the government would work with C/PA to renegotiate the 036 contract's prices if and when C/PA became a party to the contract (*id.*). According to Mr. Smith. C/PA relied upon the representations in deciding to purchase Shippers (*id.* ¶ 8).

4. Mr. Fugate admits that, during the May conversation, C/PA expressed an interest in purchasing Shippers, and a concern about the 036 contract's prices (app. resp., ex. C at 67). However, Mr. Fugate testified that his response was that, if C/PA acquired the contract, "their only recourse would be to file a claim.... But we could not make any guarantee that claim would be approved." (*Id.* at 68) Mr. Fugate denied that he said the government would renegotiate or adjust prices. He merely indicated that any change would depend upon what the claim stated, and the facts in the claim. (*Id.* at 69) Mr. Fugate does not recall if he used the exact words "work with" (*id.* at 73).

5. On September 30, 2016, Integrated Marine Services, LLC (Integrated) — which subsequently changed its name to C/PA—purchased substantially all of Shippers, including Shippers' interests in the 036 contract (R4, tab 13). On September 30, 2016, Shippers and Integrated also submitted a request to the government for novation regarding the 036 contract (R4, tab 22 at 71-73).

6. On October 1, 2016, C/PA began performing the 036 contract (R4, tab 31).

7. In October 2016, Chris Lewis, C/PA's Vice President of Operations, contacted William Seamon, another CO, to discuss renegotiating the 036 contract's prices (October conversation) (app. resp., ex. E at 86). Mr. Seamon responded that he could not speak directly to C/PA about the contract until there had been a novation (*id.*; app. resp., ex. A at 126-27). However, Mr. Lewis declares that Mr. Seamon "assured me...that the [government] would be willing to 'work with' C/PA on correcting the contracts' pricing issues...after the contracts had been successfully novated to C/PA" (R4, tab 22 at 75, ¶ 7). At his deposition, Mr. Lewis gave the following answers to the following questions:

> Q. What were the exact terms used by Mr. Seamon [during the October conversation]?
>
> A. During our conversation, Mr. Seamon said that they would be willing to work with C/PA.
>
> Q. And did he use the term "negotiate"?

3

A. I don't recall him using the direct term "negotiate."

Q. So what do you mean by the term "negotiate"?

A. What I mean by the term "work with" could also include negotiate.

....

THE REPORTER: "Question: So did Mr. Seamon agree to renegotiate the pricing terms of the contract?"

THE WITNESS: Mr. Seamon agreed to work with us.

....

Q. So your answer to that question would be—

A. Mr. Seamon agreed to work with us.

Q. It's a yes or no question.

MR. AVERY: Can you ask the question again?

THE REPORTER: "Question: So did Mr. Seamon agree to renegotiate the pricing terms of the contract?"

THE WITNESS: To specifically renegotiate? No.

(Gov't reply, ex. R-1 at 88-91) Mr. Seamon testified that he did not say that he would work with C/PA to renegotiate prices after novation (gov't mot., ex. A at 129-30).

8. On November 15, 2016, the government signed a novation agreement, approving the September 30, 2016 sale (R4, tab 10 at 8-9). Effective December 22, 2016, the government issued a modification, which incorporated the novation agreement. The modification did not change prices or require the government to renegotiate prices. On the contrary, it provided that, other than the contractor, "[a]ll other terms and conditions remain unchanged." (R4, tab 10 at 1)

9. After the novation, C/PA requested revision to the 036 contract's prices (app. resp., ex. A at 144, exs. F-G; R4, tab 42).

4

10. On January 31, 2017, the government rejected C/PA's request to renegotiate prices (R4, tab 42).

11. C/PA responded on March 15, 2017, with a notice of intent to file a claim. The notice stated that C/PA was entitled to reformation of the 036 contract, and requested a meeting. (R4, tab 15 at 2-3)

12. C/PA and the government held a meeting on March 23, 2017, to discuss the notice of intent. At that meeting, the government refused to renegotiate prices. (App. resp., ex. A at 163, ex. H at 2, ex. I at 180)

13. On June 26, 2017, C/PA filed a request for equitable adjustment (REA), asserting that the 036 contract should be reformed due to a unilateral mistake (ASBCA No. 61350 (61350) R4, tab 67 at 5-6).

14. On August 1, 2017, C/PA filed a certified claim (Claim II)[4] (R4, tab 22). Claim II first asserted that the government misrepresented its intent to renegotiate prices when it stated that it would work with C/PA (*id.* at 7). In support of that assertion, Claim II cited the October conversation, but not the May conversation (*id.* at 7, 75). Claim II also asserted that the government breached the covenant of good faith and fair dealing by misrepresenting its intent to renegotiate prices (*id.* at 7-8). C/PA attached to Claim II copies of its notice of intent to file a claim and REA, both of which sought reformation of the 036 contract (*id.* at 84-85, 92, 95-97, 99-101).

15. On August 1, 2017, C/PA also filed another certified claim (Claim III), which asserted that the government breached the covenant of good faith and fair dealing by failing to renegotiate prices after the parties executed the novation agreement (61350 R4, tab 22 at 5-6).

16. The CO denied both Claim II and Claim III on September 20, 2017 (R4, tab 23; 61350 R4, tab 23).

17. C/PA appealed the denial of Claim II, which we docketed as ASBCA No. 61349. The ASBCA No. 61349 complaint contains two counts. Count One alleges that the government misrepresented that it was willing to renegotiate prices (compl. ¶¶ 32-38). Count Two alleges that the misrepresentation constituted a breach of the covenant of good faith and fair dealing (*id.* ¶¶ 39-46).

---

[4] The claims filed on August 1, 2017, are entitled Claim II and Claim III respectively (R4, tab 22; 61350 R4, tab 22). For ease of reference, we adopt that naming convention.

5

18. C/PA also appealed the denial of Claim III, which we docketed as ASBCA No. 61350. The ASBCA No. 61350 complaint alleges that the government's failure to renegotiate prices breached the covenant of good faith and fair dealing (61350 compl. ¶¶ 31-37).

## DECISION

### I. The Standards for Summary Judgment

We grant summary judgment if a moving party has shown that there are no genuine issues of material fact, and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, if the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof, the moving party is entitled to summary judgment. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). In deciding summary judgment motions, we do not resolve controversies, weigh evidence, or make credibility determinations. *Liberty Lobby*, 477 U.S. at 255. Moreover, we draw all reasonable inferences in favor of the non-movant. *Id.*

### II. There is a Genuine Dispute About Whether there was a Misrepresentation

The government is not entitled to judgment as a matter of law on ASBCA No. 61349 Count One because there is a genuine dispute about whether the government made a misrepresentation. "Where, due to misrepresentation of one party and the mistake of the other, a written contract fails to express the agreement which they had manifested an intent that the writing should express, the victim of the misrepresentation can get a decree of reformation of the writing." *Rainbow Valley Corp.*, ASBCA No. 11691, 68-2 BCA ¶ 7195 at 33,413-14; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 166 (1981).[5] In order for a misrepresentation to be a basis for equitable relief, it must be a misstatement concerning a material fact upon which

---

[5] Reformation is not a final remedy; it merely establishes the real contract, and thus enables the aggrieved party to recover under the contract in an action at law. *Rainbow Valley*, 68-2 BCA ¶ 7195 at 33,414-15. The victim of a misrepresentation may elect to obtain relief in an action at law under one of the following theories: (1) damages for being led into the transaction; (2) rescission of the contract and restoration to his pre-contract position; or (3) enforcement against the wrongdoer of the kind of bargain he represented he was making. *Id.*

the other party relied. *Rainbow Valley*, 68-2 BCA ¶ 7195 at 33,413-14. A promise accompanied by a misstatement of existing fact may constitute a misstatement of material fact. *Id.* (holding that the government made a misrepresentation when it induced the contractor to enter into a contract by orally promising to limit the exercise of the government's contractual right to cancel a contract to cases where there was a national emergency). The rational for reformation based upon a misrepresentation is that it would be unjust to allow one who made a misrepresentation to retain the fruits of a bargain which was induced by such misrepresentation. *Dae Lim Indus. Co.*, ASBCA No. 28416, 86-3 BCA ¶ 19,244 at 97,320.[6]

Here, there are genuine disputes about whether the COs stated that they would work with C/PA, and if so, whether the most reasonable understanding of that statement would be that the government agreed to renegotiate the 036 contract's prices (SOF ¶¶ 3-4, 7). Moreover, there is a genuine dispute about whether C/PA in fact relied upon the alleged misrepresentation (SOF ¶ 3). Finally, there is a genuine dispute about whether any misrepresentation concerned a material fact. *See Rainbow Valley*, 68-2 BCA ¶ 7195 at 33,414. Therefore, there are genuine issues of material fact as to whether the government made a misrepresentation. *Id.* As a result, the government is not entitled to judgment as a matter of law.

The government first argues that we do not possess jurisdiction over the misrepresentation claim because it actually is a fraudulent inducement claim, which sounds in tort (gov't reply at 1). However, we have exercised jurisdiction over misrepresentation claims. *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 16-1 BCA ¶ 36,298 at 177,010-11; *Defense Sys. Co.*, ASBCA No. 50918, 01-1 BCA ¶ 31,152 at 153.878-79; *Rainbow Valley*, 68-2 BCA ¶ 7195 at 33,414. That is because misrepresentation claims relate to a contract by challenging the validity of an express contract. 41 U.S.C. §§ 7103(a)(1), 7105(e)(1)(A); *Frank L. Black, Jr., Inc. v. United States*, 183-79C, 1982 WL 36720, at *10 (Ct. Cl. Trial Div. Aug. 10, 1982) (rejecting the argument that the Court of Claims did not possess jurisdiction over a misrepresentation claim because it was a fraudulent inducement claim); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 166; *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163-66 (Fed. Cir. 2011) (recognizing that the same operative facts may support both a contract claim and a tort claim).

Second, the government argues that we do not possess jurisdiction over the portion of the misrepresentation claim related to the May conversation because C/PA did not present facts related to the May conversation to the CO (gov't reply at 2-3). We do not possess jurisdiction to entertain a claim unless a contractor presented it to

---

[6] While C/PA alleges bad faith, (61349 compl. ¶¶ 37-38), it is not necessary to prove bad faith in order to establish a misrepresentation claim. *Dae Lim*, 86-3 BCA ¶ 19,244 at 97,320.

the CO. *Monica Walker*, ASBCA No. 60436, 16-1 BCA ¶ 36,452 at 177,656. A claim is a new claim that was not presented to the CO if it is not based upon a common or related set of operative facts. *Id.* at 177,657. "The introduction of additional facts which do not alter the nature of the original claim...do not constitute new claims." *Trepte Constr. Co.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86. Therefore, "merely adding factual details...does not create a different claim." *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015); *see also Allied-Signal Aerospace Co.*, ASBCA No. 46890, 94-3 BCA ¶ 27,089 at 134,981.

Here, Claim II asserted that the government misrepresented its intent to renegotiate prices when it stated that it would work with C/PA (SOF ¶ 14). The only example of that purported misrepresentation cited by Claim II was the October conversation (*id.*). However, the introduction of the additional factual detail that the government purportedly made the same statement during the May conversation too does not alter the nature of the original claim. Rather, the nature of C/PA's misrepresentation claim continues to be that the government allegedly misrepresented its intent to renegotiate prices when it stated that it would work with C/PA. (*Id.*) Therefore, C/PA's assertions about the May conversation do not constitute a new claim. *K-Con*, 778 F.3d at 1006; *Trepte*, 90-1 BCA ¶ 22,595 at 113,385-86.

Third, the government argues that there is no genuine issue of material fact because the COs never stated that they would "renegotiate" prices during the May or October conversations (gov't reply at 5-12). However, Mr. Smith declares, and Mr. Lewis declares and testifies, that the COs stated that the government would "work with" C/PA (SOF ¶¶ 3, 7).[7] That evidence raises a genuine dispute as to whether the COs stated that they would work with C/PA. Moreover, it is reasonable to infer from any statement that the government would work with C/PA that the government would renegotiate the 036 contract's prices, even if the COs did not use the precise word "renegotiate" (*id.*). Whether the evidence from Mr. Smith and Mr. Lewis constitutes clear and convincing evidence that the COs stated that the government would work with C/PA—and whether the most reasonable inference from that statement would be that the government would renegotiate the 036 contract's prices—are factual issues that we cannot resolve at this stage.

The government finally argues that C/PA could not have relied upon the October conversation because it already had signed the asset purchase agreement with Shippers and submitted a request for novation prior to that conversation (gov't reply at 10). However, whether C/PA relied upon the October conversation

---

[7] The government attempts to minimize the value of Mr. Smith's statements by pointing out that he made them in a declaration (gov't reply at 11). However, it is acceptable to use declarations to establish that a fact is genuinely disputed. FED. R. CIV. P. 56(c)(1), (c)(4).

8

raises factual issues genuinely in dispute. Those include whether C/PA understood the alleged October promise as a reaffirmation of any earlier May promise to work with C/PA, or whether C/PA could and would have revoked the asset purchase agreement and novation request absent the October promise.

Because none of the government's arguments have merit, we reject its motion for summary judgment on the misrepresentation claim.

III.    C/PA Cannot Genuinely Dispute that the Government Complied with the Covenant of Good Faith and Fair Dealing

The government is entitled to judgment as a matter of law on ASBCA No. 61349 Count Two and ASBCA No. 61350 because C/PA cannot genuinely dispute that the government complied with the covenant of good faith and fair dealing. Every contract imposes upon each party a covenant of good faith and fair dealing in its performance and enforcement. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). The covenant includes a duty not to interfere with the other party's performance, and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. *Id.* The breach of the covenant of good faith and fair dealing typically involves some variation on the "bait-and-switch." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010). Under the bait-and-switch, the government first enters into a contract that awards a significant benefit in exchange for consideration. *Id.* Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. *Id.*

A breach of an implied covenant of good faith and fair dealing does not require a violation of an express provision in the contract. *Metcalf*, 742 F.3d at 994. However, a party cannot use an implied covenant of good faith and fair dealing to expand another party's contractual duties beyond those in the express contract, or to create duties inconsistent with the contract's provisions. *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017). Thus, while pre-contract actions may bear on the question of whether the government complied with its obligations that the contract eventually imposed, the pre-award conduct itself cannot breach the duty "because the covenant did not exist until the contract was signed." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012). Thus, the duty "does not deal with good faith in the formation of a contract." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. c (1981)).

Here, even inferring that the COs made pre-modification representations that they would renegotiate the 036 contract's prices, that would not demonstrate that the modified 036 contract awarded a significant benefit to C/PA because it is undisputed that the modified 036 contract itself did not require the government to renegotiate

9

prices (SOF ¶ 8). Nor was the purported subsequent refusal to renegotiate prices directed at eliminating or rescinding an existing provision of, or benefit under, the 036 contract because no existing provision of the modified 036 contract required the government to renegotiate prices, and the modified 036 contract did not extend the benefit of renegotiating prices to C/PA (*id.*). Therefore, there is no evidence reasonably suggesting a bait-and-switch. *Precision Pine*, 596 F.3d at 829.

On the contrary, C/PA improperly seeks to use the covenant of good faith and fair dealing to create duties inconsistent with the modified 036 contract's provisions by requiring the government to renegotiate prices, when the modified 036 contract expressly stated that, except for the contractor, all the terms and conditions of the original 036 contract—including the prices—would remain unchanged (SOF ¶ 8). Thus, a breach of the covenant of good faith and fair dealing claim is not the proper legal theory pursuant to which C/PA may seek to compel the government to renegotiate the 036 contract's prices. *Agility*, 852 F.3d at 1384.

Additionally, C/PA's contentions that the government breached the covenant of good faith and fair dealing fail because they deal with good faith in the formation of the novated 036 contract that made C/PA a party to the 036 contract, and therefore extended the covenant of good faith and fair dealing to C/PA. *Scott Timber*, 692 F.3d at 1372. C/PA cannot avoid that conclusion by parsing the alleged pre-modification promise to renegotiate prices and the alleged post-modification failure to keep that promise by renegotiating prices (app. resp. at 18-21). The covenant of good faith and fair dealing involves two interrelated steps: a bait and a switch. *Precision Pine*, 596 F.3d at 829. Even though the alleged switch (i.e., breaking the promise to renegotiate prices) occurred after the modification, it still dealt with good faith in the formation of the modified 036 contract because the bait to which it related (i.e., the alleged promise to renegotiate prices) was pre-award conduct.

*Teresa A. McVicker, P.C.*, ASBCA Nos. 57487, 57653, 12-2 BCA ¶ 35,127 at 172,463-64—upon which C/PA relies (app. resp. at 19)—does not compel a different conclusion. Unlike in the present case, *Teresa A. McVicker* involved a bait-and-switch by the government. The government first entered into a contract that awarded a significant benefit to the contractor—namely to be paid for providing the services of physician's assistants (PAs). Then, the government eliminated that benefit by hiring the PAs to work directly for the government. *Id.* We merely found that the government's pre-award conduct bore on the government's compliance with the duty the contract eventually imposed because it showed an intent to deprive the contractor of the contractual benefit of being able to provide PAs. *Id.* Here, by contrast, the 036 contract did not award a significant benefit by promising to renegotiate prices (SOF ¶ 8). Rather, C/PA improperly seeks to expand and alter the government's duties under the 036 contract by using the covenant of good faith and fair dealing to change

10

the 036 contract's prices. Therefore, unlike in *Teresa A. McVicker*, C/PA's breach of the covenant of good faith and fair dealing claim fails as a matter of law.

## CONCLUSION

For the reasons discussed above, we grant the government's motion for summary judgment on the breach of the covenant of good faith and fair dealing claims. Accordingly, ASBCA No. 61350 is denied and we strike Count Two of ASBCA No. 61349. However, we deny the government's motion for summary judgment regarding the misrepresentation claim contained in Count One of ASBCA No. 61349.

Dated: March 12, 2019

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61349, 61350, Appeals of Cooper/Ports America, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11