ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -                                  )
                                             )
Thalle Construction Company                  )    ASBCA Nos. 63685, 63719, 63720
                                             )              63721, 63734
                                             )
Under Contract No. W912P5-16-C-0001          )

APPEARANCES FOR THE APPELLANT:        Lochlin B. Samples, Esq.
                                      Alexander S. Hoppestad, Esq.
                                      Zachary B. Zimmerman, Esq.
                                       Smith, Currie Oles LLP
                                       Atlanta, Georgia

APPEARANCES FOR THE GOVERNMENT:       Michael P. Goodman, Esq.
                                       Engineer Chief Trial Attorney
                                      Thomas M. Taff, Jr., Esq.
                                      Kelsey C. Morgan, Esq.
                                      Monique M. Raub, Esq.
                                       Engineer Trial Attorneys
                                       U.S. Army Engineer District, Nashville

OPINION BY ADMINISTRATIVE JUDGE SWEET
ON THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

These appeals involve a contract between the United States Army Corps of Engineers, Nashville District (government) and the appellant Thalle Construction Company (Thalle) for the construction of an auxiliary dam reinforcing berm and left rim stabilization at Center Hill Reservoir in Dekalb County, Tennessee.  Thalle raises several claims on appeal, including that:  (1) it had to use a higher-cost concrete quartz aggregate supplier than the supplier prequalified in the specifications upon whom Thalle had based its proposal because the original supplier went out of business (Aggregate Supplier Claims) (ASBCA No. 63685); (2) Thalle had to import topsoil to use in areas where the contract did not require topsoil (Non-Topsoil Areas) instead of using topsoil from the stripped areas (Topsoil Claims) (ASBCA No. 63721); and (3) government delays pushed Thalle's performance into a period of worse seasonal adverse weather (Weather Delay Claims) (ASBCA No. 63734).  The government has filed a motion for partial summary judgment (Motion) on the Aggregate Supplier, the Topsoil, and the Weather Delay Claims (gov't mot. at 1).

As discussed in greater detail below, we grant the Motion as to the Aggregate Supplier Claims because Thalle has failed to raise a genuine issue of material fact

suggesting that having to use a higher-cost quartz aggregate supplier constituted a constructive change, involved superior knowledge, constituted a breach of the duty of good faith and fair dealing, or involved a defective specification. We also grant the Motion as to the Topsoil Claims to the extent that Thalle alleges that the government improperly required Thalle to import Topsoil because the contract did not indicate that all of the needed topsoil was available from the stripped areas. However, we deny the Motion as to the Topsoil Claims to the extent that Thalle alleges that the government improperly required Thalle to install topsoil in Non-Topsoil Areas because there is a genuine issue of material fact as to whether the government required Thalle to install topsoil in Non-Topsoil Areas. Finally, we deny the Motion as to the Weather Delay Claims because there is a genuine issue of material fact as to if government delays pushed Thalle's performance into a period of worse seasonal adverse weather than it would have experienced but-for the government delay.

SUMMARY JUDGMENT STANDARD

We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). In deciding summary judgment motions, we do not resolve controversies, weigh evidence, or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, we draw all reasonable inferences in favor of the non-movant. *Id*. A genuine issue of material fact arises when the non-movant presents sufficient evidence upon which a reasonable fact-finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant. *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

AGGREGATE SUPPLIER CLAIMS (ASBCA NO. 63685)

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On September 30, 2015, the government issued Request for Proposals No. W912P5-14-R-003 (Request for Proposals) for the construction of an auxiliary dam reinforcing berm and left rim stabilization at Center Hill Reservoir in Dekalb County, Tennessee (R4, tab 1 at 1-2; GSUMF ¶ 1; ARGSUMF ¶ 1).[1]

---

[1] "GSUMF" refers to the government's statement of undisputed material fact. "ARGSUMF" refers to Thalle's response to the GSUMF.

2.  Specification 03 37 23 (CONCRETE), ¶ 2.1.4.2 (CONCRETE AGGREGATE SOURCES) stated that:

> Concrete aggregates may be furnished from a source designated by the Contractor and accepted by the [contracting officer's (CO's) representative (COR)], subject to the conditions stated herein.  The COR will evaluate the quality of data based on the criteria of the paragraph QUALITY.  The proposed aggregate source shall be capable of meeting the requirements in the paragraph QUALITY.
>
> a.  List of Prequalified Sources.  The following sources were evaluated during the design phase of the project in 2012-2013 and were found at that time capable of meeting the quality requirements when suitably processed and the listed restrictions applied. . . . These sources shall meet the requirements in paragraph QUALITY.

| PREQUALIFIED AGGREGATE SOURCES | |
| --- | --- |
| QUARTZ FINE ASTM C33/C33M AGGREGATE[2] | LIMESTONE D-BASE and COARSE AGGREGATE |
| F1:  Monterey Sand <br> Monterey, TN <br><br> Restriction: must be used with a minimum 30% Class F Fly Ash and Low Alkali Cement | C1:  Vulcan Materials Company <br> Cookeville, TN <br><br> Restriction:  Must be used with a minimum 30 % Class F Fly Ash <br><br> Only the top 151 feet of bench one is acceptable, material below 151 feet is |

---

[2] Concrete is a mixture of cementious material, aggregate, and water.  Aggregate is an inert filler, but it is a necessary component that defines the concrete's thermal and elastic properties and dimensional stability.  There are two different types of aggregate—coarse and fine—which have different gradation.  *The Effect of Aggregate Properties on Concrete*, https://www.engr.psu.edu/ce/courses/ce584/ concrete/library/materials/aggregate/aggregatesmain.htm (last visited Jul. 21, 2025).  ASTM C33 is the specification from the American Society for Testing and Materials that defines the requirements for grading and quality of fine and coarse aggregate for use in concrete.  *ASTM International, ASTM C33/C33M-24a Standard Specification for Concrete Aggregates,* https://store.astm.org/ c0033_c0033m-24a.html (last visited Jul 21, 2025).

| | rejected and must not be included in project aggregate. |
|---|---|
| F2: Sand Products<br>Monterey, TN<br><br>Restriction: must be used with a minimum 30% Class F Fly Ash and Low Alkali Cement | C2: Rogers Group<br>Liberty, TN<br><br>Restriction: Must be used with a minimum 30 % Class F Fly Ash<br><br>Only the top 62 feet of bench 1 is acceptable; material below 62 feet is rejected and must not be included in project aggregate. |

Both prequalified sources have restrictions on mining depth. . . . If the Contractor cannot prove the aggregate comes from the acceptable depths, the Government shall refuse the aggregate and the Contractor shall remove and replace the aggregate at no cost to the Government.

b. Non-prequalified Sources. Any source proposed by the Contractor shall meet the requirements in paragraph QUALITY. The source shall have been tested within five years of the award of this contract to be considered valid.

c. Selection of Source. After the award of the contract, the Contractor shall designate in writing the single source or combination of sources from which to furnish aggregates. During the project, the source shall not be changed without notification to the COR and meeting the aggregate quality requirements in paragraph QUALITY.

d. Acceptance of Materials. Acceptance of a source is not to be construed as acceptance of all material from that source. The right is reserved to reject material from certain localized areas, zones, strata, ledges, benches, or channels, when such materials are unsuitable as aggregate as determined by the COR. The COR also reserves the right to reject individual units of specified materials . . . when such materials are determined to be unsuitable as described in the remainder of this paragraph. Materials produced from a source shall meet all the requirements herein.

(R4, tab 3 at 723-25)  The specifications did not guarantee that Thalle could use its chosen aggregate suppliers, or that the chosen aggregate suppliers would not go out of business (*id*.).  Nor did the government agree to bear any increased costs of obtaining aggregate should the chosen suppliers go out of business (*id*.).  Further, the specifications furnished no information on Sand Product's ability to deliver the type and amount of aggregate required by the Contract (*id*.).

3.  Specification 03 37 23, ¶ 2.1.4.3 (QUALITY) listed numerous tests and limits that aggregate had to meet, such as petrographic examination and limits on alkali-silica reactivity (R4, tab 3 at 725-29).

4.  Thalle submitted a proposal (Proposal) in response to the Request for Proposals on December 10, 2015 (GSUMF ¶ 2; ARGSUMF ¶ 2).  Thalle based its Proposal upon the pricing of the lowest-cost prequalified quartz aggregate supplier— Sand Products, LLC (Sand Products) (GSUMF ¶ 7; ARGSUMF ¶ 7).

5.  On June 29, 2016, the government awarded Contract No. W912P5-16-C-001 (Contract) to Thalle.  The Contract was a firm-fixed price contract in the amount of $42,972,545 based upon the Request for Proposals and the Proposal.  (R4, tab 4 at 2,432-33; GSUMF ¶ 3; ARGSUMF ¶ 3)  The Contract incorporated by reference Federal Acquisition Regulation (FAR) 52.242-14 (Suspension of Work (APR 1984)) (R4, tab 4 at 2,478), which provided that Thalle was entitled to an adjustment for any increase in the cost of performance necessarily resulting from any unreasonable suspension, delay, or interruption caused by an act or omission of the CO.  48 C.F.R. § 52.242-14(b).  The Contract also incorporated by reference FAR 52.243-4 (Changes (JUN 2007)) (R4, tab 4 at 2,478), which required the CO to provide an equitable adjustment for any changes to the Contract.  48 C.F.R. § 52.243-4(d).

6.  After performance began, Thalle submitted a request for information on October 14, 2016, indicating that "[b]ased on previous contractors and [government] experience with the approved sand source history, Thalle has a concern for available sand sources meeting an American Society for Testing and Materials (ASTM) C 33 standard. . . . Thalle requests a variance from ASTM C 33 to Tennessee Department Of Transportation (TDOT) Fine Aggregates specification 903.01 pg 920"[3] (gov't mot., ex. 1).  In response, the government relaxed the requirements for quartz aggregate (*id*.).

---

[3] TDOT Fine Aggregates specification 903.01 pg. 920 is the TDOT quality requirements for fine aggregate for road and bridge construction (*Supplemental Specifications – Section 900 of the Standard Specifications for Road and Bridge Construction January 1, 2015*, https://www.tn.gov/content/dam/tn/tdot/ construction/supplemental-specifications/Const_2015_900SS.pdf).

7.  On December 15, 2017, Thalle submitted a product submittal, which included aggregate supplied by Sand Products (GSUMF ¶ 10; ARGSUMF ¶ 10).  The government approved that submittal on April 16, 2018 (R4, tab 11 at 2,568).

8.  In an email to the government dated March 27, 2018, Thalle's project manager expressed:

> [G]rowing concerns with Sand Products and the overall sand supply for the Center Hill Project.  The property owner sold the lease for the land and equipment back in the fall of 2017.  The current lease owners have been struggling and currently have the lease on the market. They can't keep the plant running and [are] struggling to provide enough sand for our plant testing and trial batching.  Their future in the sand business and uncertainty in future owners has the potential to be a major impact to our project.

(R4, tab 10)  Thalle's project manager continued that Thalle was exploring using the other prequalified quartz aggregate supplier—Monterey Sand, which by then had become Vulcan Materials (Vulcan) (*id.*).[4]  However, there were issues with Vulcan meeting the testing requirements and "[t]here is a significant cost increase to utilize Vulcan materials" (*id.*).

9.  Sand Products went out of business, requiring Thalle to use Vulcan as its quartz aggregate supplier (Bowen decl. ¶ 5 (app. opp'n, ex. 2)).  There is no evidence that the government caused Sand Products to go out of business.  Nor is there any evidence that the government knew, or should have known, that Sand Products would go out of business.  There also is no evidence that the government compelled or directed Thalle to use Vulcan.  Vulcan's quartz aggregate was more expensive than Sand Products' quartz aggregate (*id.*).

10.  On May 16, 2018, Thalle submitted a project submittal, which informed the government that Thalle had changed its quartz aggregate supplier to Vulcan, and provided testing results (gov't mot., ex. 3).  Because Vulcan could not meet the contract quality requirements, Thalle sought a variance (Bowen decl. ¶ 5).  The government approved the submittal, with certain exceptions, on June 1, 2018 (gov't mot., ex. 4).

---

[4] In or about January 2017, Vulcan Materials Co. acquired Monterey Sand (GSUMF ¶ 6 n.1; ARGSUMF ¶ 6).

11. On December 19, 2019, Thalle submitted a request for an equitable adjustment for its increased costs to acquire quartz aggregate from Vulcan instead of Sand Products (R4, tab 16 at 2,660-62). The request for an equitable adjustment stated that:

> Thalle was informed after award that previous Government projects at the [Center Hill Auxiliary Dam] location utilizing the preapproved sand sources required Government approved gradation variances prior to acceptance. Thalle was advised that a Request for Information (RFI) should be submitted for a like gradation variance. Thalle submitted RFI-003 and received approval for a sand gradation variance.

(*Id*. at 2,664) The CO denied that request for an equitable adjustment on August 11, 2020 (R4, tab 27).

12. On February 10, 2023, Thalle submitted a certified claim (R4, tab 35). The CO issued a final decision denying the claim on May 18, 2023 (R4, tab 42).

13. An appeal followed, which we docketed as ASBCA No. 63685.

14. The government moved for partial summary judgment. In support of its opposition to that motion, Thalle submits an affidavit from its project manager, stating that "Thalle subsequently learned after responding to the Project Solicitation that the Government had superior knowledge about the inability of the prequalified materials to meet the QUALITY requirements in the Specifications without an approved variation" (Bowen decl. ¶ 4).

## DECISION ON ASBCA NO. 63685 (AGGREGATE SUPPLIER CLAIMS)

Thalle has failed to raise a genuine issue of material fact suggesting that having to use Vulcan instead of Sand Products constituted a constructive change, involved superior knowledge, constituted a breach of the duty of good faith and fair dealing, or involved a defective specifications (*see* ASBCA No. 63685, compl. ¶¶ 37-53).

I. Aggregate Supplier Constructive Change Claim

In order to demonstrate a constructive change, a plaintiff must show that: (1) it performed work beyond the contract requirements (Change Element); and (2) the government ordered, expressly or impliedly, the additional work (Order Element). *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). Here, Thalle has failed to raise a genuine issue of material fact as to either element.

7

Under the Change Element, Thalle argues that it performed work beyond the contract requirements because the Contract indicated that it could utilize Sand Products to supply quartz aggregate, but Thalle had to use a more expensive supplier (*i.e.*, Vulcan)[5] (ASBCA No. 63685, compl. ¶¶ 23, 27; app. opp'n at13-14). Thalle is unclear whether it is arguing that the Contract permitted it to use Sand Products, or that the Contract guaranteed that it could use Sand Products (ASBCA No. 63685, compl. ¶¶ 23, 27; app. opp'n at 13-14). To the extent that Thalle is arguing that the Contract permitted it to use Sand Products, that argument would be insufficient to establish a constructive change claim. While it was permissible for Thalle to use Sand Products under the Contract, it was Thalle's responsibility to select a quartz aggregate supplier (ASBCA No. 63685, SOF ¶ 2). Under this firm-fixed price Contract (*id*. at ¶ 5), Thalle was responsible for any price increases that resulted from problems obtaining aggregate from its chosen suppliers, absent an agreement to the contrary. *Marvin D. Whitehead*, ASBCA No. 22,598, 78-1 BCA ¶ 13,176 at 64,441. Because Thalle must show an agreement for the government to bear responsibility for any price increases, Thalle cannot establish a constructive change by merely demonstrating that the Contract permitted Thalle to use Sand Products.

To the extent that Thalle is arguing that the government agreed to bear the increased costs of Thalle having to use a different quartz aggregate supplier by guaranteeing that Thalle could use Sand Products, the plain language of the Contract undermines any such argument. In determining what work a contract requires under the Change Element, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc).

Here, the plain language of the Contract merely indicated that Sand Products could meet the quality requirements at the time that the government evaluated it during the design phase, and that Sand Products "shall meet the requirements in paragraph QUALITY."[6] (ASBCA No. 63685 SOF ¶ 2). It did not guarantee that Thalle could use Sand Products as its quartz aggregate supplier or that Sand Products would not go out of business (*id.*). Nor did the government agree to bear any increased costs of obtaining aggregate quartz should Sand Products go out of business (*id.*). Because there was no express agreement to the contrary, Thalle bore the risk that its quartz

---

[5] Of course, neither the Contract nor the government required Thalle to use Vulcan. Rather, Thalle was free to use any supplier that could meet the contract requirements, and Thalle chose to use Vulcan (ASBCA No. 63685 SOF ¶¶ 2, 9-10).

[6] We assume without deciding that the phrase that Sand Products "shall meet the requirements in paragraph QUALITY" mandated that the government must accept that Sand Products meets the quality requirements, instead of mandating that Sand Product must establish that it meets the quality requirements.

aggregate supplier going out of business would increase Thalle's costs for quartz aggregate under this fixed-price Contract. *See Whitehead*, 78-1 BCA ¶ 13,176 at 64,441.

Under the Order Element, Thalle argues that the government implicitly ordered it to use another supplier through its "constructive elimination" of Sand Products (ASBCA No. 63685, compl. ¶¶ 23, 27; app. opp'n at 13-14). However, Thalle does not even define what it means by the term constructive elimination, let alone point to any precedent holding that "constructive elimination" of a supplier constitutes an order by the government (*id.*). Rather, under our precedent, a contractor must show that an official required or compelled the contractor to perform the work not required under the terms of the contract in order to satisfy the Order Element. *David Boland, Inc.*, ASBCA No. 61923, 21-1 BCA ¶ 37,822 at 183,657. Thus, when a contractor asserts that a change in suppliers constituted a constructive change, the contractor must prove, *inter alia*, that the government compelled the contractor to change suppliers. *MC II Generator & Elec.*, ASBCA No. 53389, 04-1 BCA ¶ 32,569 at 161,169.

Here, a reasonable fact-finder, drawing the requisite inferences and applying the applicable evidentiary standard, could not decide that the government compelled Thalle to change suppliers. On the contrary, Thalle admits that the factor that compelled it to change suppliers was Sand Products going out of business (ASBCA No. 63685, SOF ¶ 9; app. opp'n at 8; ASBCA No. 63685, compl. ¶ 20). There is no evidence that the government played any role in Sand Products going out of business (ASBCA No. 63685, SOF ¶ 9). Because Thalle has failed to present sufficient evidence upon which a reasonable fact-finder could decide that the government compelled Thalle to change suppliers, it has failed to raise a genuine issue of material fact suggesting that the government ordered any change. Thus, the government is entitled to summary judgment on Thalle's Aggregate Supplier Constructive Change Claim.

## II. Aggregate Supplier Superior Knowledge Claim

Thalle has failed to raise a genuine issue of material fact suggesting that the government had superior knowledge. In order to prevail on a superior knowledge claim, a contractor must show that: (1) it undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware that the contractor had no knowledge of, and had no reason to obtain, such information; (3) any contract specification supplied mislead the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *CAE USA, Inc.*, ASBCA No. 58006, 13 BCA ¶ 35,323 at 173,390. Moreover, a contractor must show "the requisite causal relationship between a Government nondisclosure of vital superior information and the contractor's

9

difficulties concerning which claim is made." *Singer-Gen. Precision Inc., Librascope Div.*, ASBCA No. 15396, 73-2 BCA ¶ 10,350 at 48,891.

Here, Thalle has failed to present sufficient evidence upon which a reasonable fact-finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide that any contract specification mislead Thalle, or did not put it on notice to inquire. Thalle relies upon a statement in its project manager's declaration that "Thalle subsequently learned after responding to the Project Solicitation that the Government had superior knowledge about the inability of the prequalified materials to meet the QUALITY requirements in the Specifications without an approved variation" (ASBCA No. 63685, SOF ¶ 14; app. opp'n at 8). A reasonable fact-finder could not rely upon that vague declaration because it merely asserts a legal conclusion, without identifying any of the specific facts supporting that conclusion (ASBCA No. 63685, SOF ¶ 14). *See also Claude E. Atkins Enterprises, Inc.*, ASBCA No. 31864, 88-3 BCA ¶ 20,919 at 105,724-25. To the extent that the project manager is referring to the allegation in Thalle's request for an equitable adjustment that "Thalle was informed after award that previous Government projects at the [Center Hill Auxiliary Dam] location utilizing the preapproved sand sources required Government approved gradation variances prior to acceptance," (ASBCA No. 63685, SOF ¶ 11; app. opp'n at 8) that would be insufficient to raise a genuine issue of material fact because bare allegations in a request for an equitable adjustment are not proof of disputed facts. *In re Cascade Gen., Inc.*, ASBCA No. 47754, 00- 2 BCA ¶ 31,093 at 153,531.

Even if Thalle had presented evidence raising a genuine issue of material fact suggesting that the government knew—and failed to disclose—that Sand Products was unable to satisfy the quality requirements absent a variance on prior projects, a reasonable fact-finder could not decide that there was the requisite causal relationship between that alleged non-disclosure and the difficulties concerning which Thalle makes its claim—namely having to use a more-expensive-than-expected supplier (*i.e.*, Vulcan). There is no genuine issue of material fact suggesting that the cause of Thalle's having to utilize Vulcan was Sand Products' inability to meet the quality requirements absent a variance because the undisputed evidence shows that the government granted a variance for this Contract too, and approved the product submittal for Sand Products' quartz aggregate (ASBCA No. 63685, SOF ¶¶ 6-7). Rather, the undisputed evidence shows that the cause of Thalle's having to use Vulcan was Sand Products going out of business (ASBCA No. 63685, SOF ¶ 9; app. opp'n at 8; ASBCA No. 63685, compl. ¶ 20). Because Thalle has failed to present sufficient evidence upon which a reasonable fact-finder could decide that there was a causal relationship between any nondisclosure of Sand Products' requiring a variance and Thalle's difficulties of having to use Vulcan, there is no genuine issue of material fact supporting a superior knowledge claim.

III.  Aggregate Supplier Breach of the Duty of Good Faith and Fair Dealing Claim

Thalle has failed to raise a genuine issue of material fact suggesting that the government breached the duty of good faith and fair dealing.  "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (internal citation omitted).  The duty requires each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  However, a party cannot use an implied duty of good faith and fair dealing claim to expand another party's contractual duties beyond those in the contract, or to create duties inconsistent with the contract's provisions.  *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017).

Here, Thalle first argues that the government breached the duty of good faith and fair dealing by allowing it to rely upon a prequalified supplier that the government knew, or should have known, was incapable of performance (ASBCA No. 63685 compl. ¶ 47).  We entertain serious doubts that the "knew or should have known" rubric is applicable to a good faith and fair dealing claim, especially since the real thrust of these allegations appears to be a complaint about the government's pre-award conduct, while the duty of good faith and fair dealing does not apply until contract award.  *See, e.g., Scott Timber v. United* States, 692 F.3d 1365, 1372 (Fed. Cir. 2012).  We need not decide that legal issue, however, since, as discussed above, Thalle has produced no evidence that the government knew, or should have known, that Sand Products would go out of business—which was the reason it was incapable of performance (ASBCA No. 63685 SOF ¶ 9).  Further, as discussed above, there is no evidence that the government knew, or should have known, that Sand Products could not meet the quality requirements, which—in any event—is irrelevant because the government granted a variance and accepted a product submittal for Sand Products' quartz aggregate, so any failure to meet the quality requirement was not the reason that Sand Products was incapable of performance (*id.* at ¶¶ 6-7).

Thalle next argues that the government breached the duty of good faith and fair dealing by forcing it to utilize a more expensive quartz aggregate supplier when Sand Products was unable to perform (ASBCA No. 63685 compl. ¶ 48).  However, as discussed above, Thalle has failed to present evidence upon which a reasonable fact-finder could decide that the government forced Thalle to use Vulcan (ASBCA No. 63685, SOF ¶ 9).  Rather, the undisputed evidence shows that the reason that Thalle had to use Vulcan was because Sand Products went out of business through no fault of the government (*id.*).  Thus, Thalle has failed to raise a genuine issue of material fact suggesting that the government breached its duty of good faith and fair dealings.

11

IV. Aggregate Supplier Defective Specification Claim

Thalle has failed to raise a genuine issue of material fact suggesting that the Contract contained defective specifications. As the United States Court of Appeals for the Federal Circuit has recognized:

> When the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach.

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000). The government provides a contractor with defective specifications when it furnishes information a bidder may rely upon in calculating its bid that turns out to be inaccurate. *Bailey & Son Const. Co., Inc.*, ASBCA No. 38435, 90-1 BCA ¶ 22,419 at 112,612. A contractor may not prevail on a defective specifications claim when it has assumed the risk of performance. *RLB Contracting, Inc.*, ASBCA No. 62779, 23-1 BCA ¶ 38,374 at 186,411. "In order to establish a defective specifications claim, the contractor bears the burden of establishing the fundamental facts of liability, causation, and resulting injury." *Id*. (citing *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968 (Ct. Cl. 1965)).

Here, Thalle argues that the government furnished information that turned out to be inaccurate when it allegedly represented that Sand Products could deliver the type, amount, and quality of aggregate required by the Contract (ASBCA No. 63685, compl. ¶ 31). However, the Contract furnished no information on Sand Product's ability to deliver the type and amount of aggregate required by the Contract (ASBCA No. 63685, SOF ¶ 2). Moreover, while the contract indicated that Sand Products shall meet the quality requirement, Thalle has failed to provide sufficient evidence upon which a reasonable fact-finder could decide that that information was inaccurate because the government granted a variance allowing Sand Products' quartz aggregate to meet the quality requirement and accepted the product submittal for that aggregate. Further, Thalle has failed to provide sufficient evidence upon which a reasonable fact-finder could decide that any inaccuracy in that statement caused Thalle's increased costs because, as discussed above, the reason that Thalle had to utilize a more expensive supplier was because Sand Products went out of business; not because Sand Products' quartz aggregate could not meet the quality requirements. (*Id.*) Thalle has failed to provide sufficient evidence upon which a reasonable fact-finder could decide that the government furnished inaccurate information indicating that Sand Products would remain in business during performance upon which Thalle could rely upon in calculating its bid (*id*.). It is a fact of life that companies sometimes go out of

12

business; the representation that a particular company meets quality requirements, without more, is not a government promise that said company will continue to exist throughout contract performance. Therefore, Thalle has failed to raise a genuine issue of material fact supporting its defective specification claim.

## TOPSOIL CLAIMS (ASBCA NO. 63721)

### STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. Specification 31 00 00 (EARTHWORK), ¶ 3.3 (STRIPPING OF TOPSOIL) required Thalle to remove and store topsoil "[w]here areas of construction require the removal of topsoil or where construction activities severely damage the existing landscape" (R4, tab 3 at 999). Specification 31 00 00, ¶ 3.12 (PLACING OF TOPSOIL) then required Thalle to replace topsoil "[o]n areas to receive topsoil" (R4, tab 3 at 1002). It expressly stated that "[o]btaining material required for topsoil in excess of that produced by excavation within the grading limits set shall be the responsibility of the Contractor" (*id.*).

2. Specification 32 92 19 (SEEDING), ¶ 1.1 (SCOPE) required the installation of topsoil to establish satisfactory grass cover (R4, tab 3 at 1,131). It required grass and/or trees "in areas where trees have been cut and the ground disturbed, or in areas shown on drawings" (*id.*). Specification 32 92 19, ¶ 2.2 (TOPSOIL) stated that "[t]opsoil shall be obtained from the stripped areas . . ." (*id.* at 1,135).

3. Also in the record are a series of drawings (Drawings) (R4, tab 59). Drawings G-08 and G-09 show the Contractors Work Limits for the RCC Reinforcing Berm and the Left Rim respectively (*id.* at 4,284-85). Drawing B-15 shows the Pre-Excavation Plan for the Left Rim, which shows the excavation limits (*id.* at 4,305). Drawing C-01 shows the Grading Plan for the RCC Reenforcing Berm (*id.* at 4,320).

4. On March 9, 2020, the government sent two photographs (Photographs) identifying areas requiring topsoil, grass, and/or trees (R4, tab 19). Neither party points to any evidence comparing the area shown in the Photographs to the areas shown in the Drawings, and that comparison is not self-evident.

5. On March 23, 2020, Thalle sent a letter to the government notifying it of a deficit of on-site stockpiled topsoil to meet the project's needs (R4, tab 20 at 2,722). In the letter, Thalle stated its position that it was not responsible for the cost of importing topsoil from off-site (*id.*).

6. On July 20, 2020, Thalle submitted a request for an equitable adjustment regarding the topsoil (R4, tab 26), which the government rejected (R4, tab 28).

13

7. Thalle then submitted a certified claim on April 10, 2023 (R4, tab 38). The CO issued a final decision denying the claim on August 23, 2023 (R4, tab 51).

8. Thalle then filed an appeal, which we docketed as ASBCA No. 63721.

### DECISION ON ASBCA NO. 63721 (TOPSOIL CLAIMS)

While Thalle presents various legal theories,[7] the central allegations regarding its Topsoil Claims are that the government changed the Contract's requirements when it directed Thalle to import topsoil for grass and trees in Non-Topsoil Areas (ASBCA No. 63721 compl. ¶ 17). Thalle is unclear whether the reason that that direction constituted a change was because the Contract indicated that all topsoil was available from the stripped areas, the Contract did not require Thalle to install topsoil in the Non-Topsoil Areas, or both (*compare id*. ¶ 12 *with* app. opp'n at 20-21).

To the extent that Thalle is basing its claim upon an assertion that the Contract indicated that all topsoil was available from the stripped areas, it has failed to raise a genuine issue of material fact on that issue. When interpreting a contract, we read the contract as a whole, to the extent possible, giving meaning to all of its parts, and "without leaving a portion of the contract useless, inexplicable, void, or superfluous." *JAAAT Technical Serv., LLC*, ASBCA No. 61180, 19-1 BCA ¶ 37,297 at 181,429 (quoting *Certified Constr. Co. of Kentucky, LLC*, ASBCA No. 58782, 15-1 BCA ¶ 36,068 at 176,131-32).

Here, Thalle relies upon specification 32 92 19, ¶ 2.2 (app. opp'n at 19), which stated that "[t]opsoil shall be obtained from the stripped areas" (ASBCA No. 63721 SOF ¶ 2). However, that specification did not expressly require that <u>all</u> topsoil be obtained from the stripped areas (*id*.). Thus, it can—and must—be read together as a whole with specification 31 00 00, ¶ 3.12—which stated that, "[o]btaining material required for topsoil in excess of that produced by excavation within the grading limits set shall be the responsibility of the Contractor" (*id*. at ¶ 1)—giving meaning to both specifications, and without leaving either specification useless, inexplicable, void, or superfluous. We do so by reading specification 32 92 19, ¶ 2.2 as requiring Thalle to first obtain topsoil from the stripped areas, and specification 31 00 00, ¶ 3.12 as requiring Thalle then to obtain topsoil in excess of that produced by excavation in the stripped areas from other sources. Thus, Thalle has failed to raise a genuine issue of material fact suggesting that the government changed the Contract's requirements when it directed Thalle to import topsoil in excess of that produced by excavation of the stripped areas.

---

[7] In particular, Thalle asserts constructive change, breach of the duty of good faith and fair dealing, and defective specification theories (ASBCA No. 63721 compl. ¶¶ 34-48).

14

However, regardless of the source of the topsoil, Thalle has raised a genuine issue of material fact as to whether the government changed the Contract's requirements when it purportedly required Thalle to install topsoil in Non-Topsoil Areas. The parties do not dispute that specification 31 00 00, ¶ 3.3 required Thalle to remove topsoil "[w]here areas of construction require the removal of topsoil or where construction activities severely damage the existing landscape," and to replace topsoil on areas requiring topsoil (ASBCA No. 63721 SOF ¶ 1). Similarly, the parties agree that specification 32 92 1, ¶ 1.1 required the installation of topsoil to establish satisfactory grass cover "in areas where trees have been cut and the ground disturbed, or in areas shown on drawings" (*id*. at ¶ 2).

What the parties disagree over is whether the area shown in the Photographs where the government directed Thalle to install topsoil exceeded the areas where construction required the removal of topsoil, the areas where construction activities severely damaged the existing landscape, the areas where trees had been cut and the ground disturbed, or the areas shown on the drawings (*compare* gov't mot. at 24 *with* app. opp'n at 20). Yet neither party submits evidence comparing the areas shown on the Photographs to the area shown on the Drawings, and that comparison is not self-evident (ASBCA No. 63721 SOF ¶ 4). Therefore, summary judgment is not appropriate on the issue of whether the government changed the Contract's requirements when it purportedly directed Thalle to install topsoil in Non-Topsoil Areas.

## WEATHER DELAY CLAIMS (ASBCA NO. 63734)

### STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. The Contract contained a clause for time extensions for unusually severe weather (Weather Clause). The Weather Clause provided that, under FAR 52.249-10, Thalle was entitled to a time extension for delays caused by unusually severe weather that was worse than the adverse weather anticipated for the project during the month (R4, tab 4 at 2,500). The Weather Clause then defined the anticipated adverse weather days as follows:

Anticipated Adverse Weather Delays in Contract

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 9 | 8 | 8 | 7 | 7 | 7 | 7 | 6 | 5 | 6 | 7 | 9 |

(*id*.).

2. The original contract completion date (CCD) was 940 days after Thalle received the notice to proceed. Thalle received the notice to proceed on September 12,

2016.  Thus, the original CCD was April 10, 2019.  (R4, tab 5; GSUMF ¶ 22; ARGSUMF ¶ 22)

3.  During performance, the government issued the following modifications extending the CCD for various reasons—including weather delays—as follows:

Modifications

| Mod. # | Weather Delay Period | # of Days | Adjusted CCD | Type | Date | Cite (R4, tab) |
|---|---|---|---|---|---|---|
| A00001 | 06/16-04/17 | 20 | 04/30/19 | Bilateral | 06/27/17 | 6 |
| A00002 | 05/17-10/17 | 8 | 05/08/19 | Bilateral | 02/01/18 | 8 |
| A00004 | 11/17-01/18 | 10 | 05/18/19 | Bilateral | 02/23/18 | 9 |
| P00009 | 02/18-05/19 | 169 | 11/03/19 | Bilateral | 06/19/19 | 12 |
| P00010 | 06/19-01/20 | 13 | 11/16/19 | Unilateral | 04/02/20 | 21 |
| P00017 | - | 243 | 07/16/22 | Bilateral | 03/01/21 | 31 |
| A00011 | - | 6 | 07/22/20 | Bilateral | 12/15/21 | 33 |

(R4, tabs 6, 8-9, 12, 21, 31).

4.  In particular, Modification No. P00009 granted Thalle:  (1) a 40 day[8] non-compensable extension due to weather delays between February 18, 2019 and May 19, 2019; (2) a 52 day non-compensable extension due to delays related to the roller compacted concrete berm top of bedrock (Berm Delay); and (3) a 77 day compensable extension regarding the Berm Delay (R4, tab 12 at 2,638-39).  Modification No. P00009 stated that "[i]t is understood and agreed that pursuant to the above, the contract time is INCREASED and the contract price REMAINS UNCHANGED as stated above, which reflects all credits due the Government and all [debts] due the Contractor with the exception of the costs has not been agreed upon [sic]" regarding the Berm Delay.  Modification No. P00009 required Thalle to submit a proposal for modified pricing that included "all direct and indirect costs [and] any impacted costs" as a result of the Berm Delay.  (R4, tab 12 at 2,640)  The government has not pointed to evidence that Thalle submitted a proposal for modified pricing regarding the Berm Delay, or that the parties agreed to release all claims regarding any such proposed costs.

---

[8] All days are in calendar days.

16

5. Modification No. P00017 granted Thalle 243 days to install shotcrete[9] on the left rim north slope (R4, tab 31 at 2,957-58). The release for Modification No. P00017 stated that:

> It is understood and agreed that, pursuant to the above, the contract time and the contract price are increased as stated above, which reflects all credits due the Government and all [debts] due the Contractor for work associated with . . . MT021-1-NTE Left Rim Reinforcement North Slope, MT021-2-Part 2 Left Rim Reinforcement North Slope, and MT023-Temp Shoring on North Slope. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated. Furthermore, the Contract time increase of 243 calendar days includes all time impacts associated with Contract changes MT020-Left Rim Stabilization South Slope, MT021-1 NTE-Left Rim Reinforcement North Slope, MT021-2-Part 2 Left Rim Reinforcement North Slope, and MT023-Temp Shoring on North Slope, and will conclude all time adjustments to this contract for adverse weather. Thalle reserves the right to submit a claim for costs incurred due to adverse weather days between 03 November 2019 and 22 July 2020 unrelated to the left rim work that is the subject of this modification.

(R4, tab 31 at 2,958)

6. Thalle achieved substantial completion on July 22, 2020 (gov't mot. ex. 5).

7. On March 26, 2021, Thalle submitted a request for an equitable adjustment for $1,255,690 in costs associated with 39 days of adverse weather delays encountered between November 4, 2019 and July 22, 2020. The request for equitable adjustment excluded all costs related to the Left Rim scope of work. (R4, tab 32 at 2,963, 2,965)

---

[9] Shotcrete is a mortar with fine aggregate that a contractor sprays directly on to a slope to protect a surface from erosion or to provide structural support. Federal Highway Administration, *Context Sensitive Rock Slope Design Solutions*, ch. 5 (Rock Slope Stabilization) (2011), https://www.fhwa.dot.gov/clas/ctip/context_sensitive_rock_slope_design/ch_5_3.aspx).

On January 27, 2022, the government denied the request for equitable adjustment (R4, tab 34).

8. On June 5, 2023, Thalle submitted a certified claim (R4, tab 43 at 3,498-99, 3,501). The CO issued a final decision denying the claim on September 29, 2023 (R4 tab 57).

9. An appeal followed, which we docketed as ASBCA No. 63734.

DECISION ON ASBCA NO. 63734 (WEATHER DELAY CLAIMS)

Thalle has raised a genuine issue of material fact as to whether government delays pushed its performance into a period of worse seasonal adverse weather.[10] Moreover, Thalle has raised a genuine issue of material fact as to whether the government has satisfied its burden of proving the affirmative defenses of release of that claim or accord and satisfaction.

I. The Merits

Thalle has raised a genuine issue of material fact regarding its Weather Delay Claims. We have recognized that:

> A contractor is entitled to an additional equitable adjustment when a government delay pushes a contractor's performance into a period of seasonal adverse weather—such as a rainy season—but a contractor is not entitled to such an adjustment when the government's delay pushes the contractor's performance into a period of unusual adverse weather because the additional weather delay is not reasonably foreseeable in that case.

---

[10] We recognize two distinct types of weather delay claims. *Dick Pacific Constr. Co.*, ASBCA No. 57675, 16-1 BCA ¶ 36,196 at 176,632. First, under a weather clause or a differing site conditions clause, unusually severe weather constitutes excusable—but not compensable—delay, while seasonal variation offers no basis for relief. *Id.* Second, as discussed above, a contractor may bring a claim for compensable delay when government delay pushes a contractor's performance into a period of worse seasonal adverse—but not unusually severe—weather. *Id.*; *Nassar Grp., Int'l*, ASBCA No. 58451 *et al.*, 19-1 BCA ¶ 37,405 at 181,833-34. Here, Thalle brings the latter type of weather delay claim (app. opp'n at 23-24, 26-27).

18

*Nassar Gp., Int'l*, ASBCA No. 58451 *et al.*, 19-1 BCA ¶ 37,405 at 181,833-34 (citing *DTC Engineers & Constructors, LLC*, ASBCA No. 57614, 12-1 BCA ¶ 34,967 at 171,898; *Charles G. Williams Const., Inc.*, ASBCA No. 42592, 92-1 BCA ¶ 24,635 at 122,930).

Here, while Thalle presents various legal theories,[11] its central allegation is that it experienced 39 days of compensable delay because the government delays addressed by Modification No. P00009[12] pushed Thalle's last 262 days of performance into a period of worse seasonal adverse weather between November 4, 2019 (the CCD, as amended by Modification No. P0009) and July 22, 2020 (the substantial completion date) (Delay Period) (app. opp'n at 23, 26-28). In support of that argument, Thalle points to the fact that—except for February 2019—it is seeking compensation for fewer days of adverse weather delays than the anticipated adverse weather delays allotted by the Contract for each month of the Delay Period (app. opp'n at 28-29). Regarding the merits of that argument, the government argues that the government delays did not push Thalle's performance into a period of worse seasonal adverse weather because the last 262 days of performance prior to the original CCD (Government But-For Period) was supposed to be in the same late winter to early spring season as the Delay Period (gov't mot. at 36).

Thalle is correct that a reasonable fact-finder may rely upon the anticipated adverse weather delays allotted by a contract as evidence of seasonal adverse weather. *See Dick Pacific Constr. Co.*, ASBCA No. 57675, 16-1 BCA ¶ 36,196 at 176,632. However, Thalle's comparison of the weather delays it actually experienced during the Delay Period to the anticipated adverse weather days allotted by the Contract for the Delay Period is improper. Rather, to determine if government delays pushed a contractor's performance into a period of worse seasonal adverse weather, we compare the seasonal adverse weather that the contractor experienced during the actual period of performance with the seasonal adverse weather that the contractor would have

---

[11] In particular, Thalle asserts constructive change, constructive suspension, and breach of the duty of good faith and fair dealing theories (ASBCA No. 63734, compl. ¶¶ 29-43).

[12] While Thalle's brief seems to attempt to broaden the government delays that allegedly pushed performance into a period of worse seasonal adverse weather to the government delays addressed by all of the modifications (app. opp'n at 23), Thalle's complaint only refers to the government delays addressed by Modification No. P00009 in particular (ASBCA No. 63734, compl. ¶¶ 11-14, 18). Absent a request for leave to amend the complaint, we adopt the allegation that the government delays that pushed performance into a period of worse seasonal adverse weather was the government delays addressed by Modification No. P00009.

experienced during the period of performance, but-for the government delays (But-For Period). *See Williams Const.*, 92-1 BCA ¶ 24,635 at 122,930.

Nevertheless, the anticipated adverse weather delays allotted by the Contract raise a genuine issue of material fact as to if the government is correct in its suggestion that the seasonal adverse weather that Thalle experienced during the Delay Period was the same as the seasonal adverse weather during the Government But-For Period.[13] The anticipated adverse weather delays allotted by the Contract were as follows:

Anticipated Adverse Weather Delays Per Month (in Days) in Contract

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 9 | 8 | 8 | 7 | 7 | 7 | 7 | 6 | 5 | 6 | 7 | 9 |

(ASBCA No. 63734 SOF ¶ 1). The Delay Period was between November 4, 2019 and July 22, 2020 (ASBCA No. 63734 compl. ¶¶ 11-14, 18; ASBCA No. 63734 SOF ¶ 7). Thus, the anticipated adverse weather delays allotted by the Contract for the Delay Period were as follows:

Anticipated Adverse Weather Delays During Delay Period (in Days)[14]

| NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | TOTAL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 6.21 | 9 | 9 | 8 | 8 | 7 | 7 | 7 | 5.06 | 66.27 |

---

[13] It is not clear that the Government But-For Period is the proper But-For Period because the proper But-For Period appears to be the period of performance but-for the government delays, *see Williams Const.*, 92-1 BCA ¶ 24,635 at 122,930, while the Government But-For Period (*i.e.*, the last 262 days of the original period of performance) is the period of performance but-for all of the delay, and all of the delays addressed in Modification No. P0009—or indeed in all of the modifications—do not appear to be government delays (ASBCA No. 63734 SOF ¶¶ 3-4). However, the parties do not address the issue, and it raises factual issues that are more appropriately addressed at a hearing on the merits.

[14] For the portions of a period that only included parts of a month we calculated the anticipated adverse weather delay as follows. First, we convert the anticipated adverse weather delays in the Contract—which were expressed in days per month—into an anticipated adverse weather delay expressed in portions of a day per day by dividing the anticipated adverse weather delays in the Contract for each month by the number of days in that month. Second, we multiply those anticipated adverse weather delays (in portion of a day per day) by the number of days from that month included in the relevant period.

20

Turning to the Government But-For Period, the original CCD was April 10, 2019 (ASBCA No. 63734 SOF ¶ 2), so the final 262 days of performance would have been between July 22, 2018 and April 10, 2019. Thus, the anticipated adverse weather delays allotted by the Contract for the Government But-For Period were as follows:

Anticipated Adverse Weather Delays
During the Government But-For Period (in Days)

| JUL | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | TOTAL |
|-----|-----|------|-----|-----|-----|-----|-----|-----|-----|-------|
| 2.3 | 6 | 5 | 6 | 7 | 9 | 9 | 8 | 8 | 2.3 | 62.6 |

As a result, a reasonable fact-finder could decide based upon the anticipated adverse weather delays allotted by the Contract that Thalle experienced about 4 more days (66.27 days - 62.6 days) of seasonal adverse weather delays during the Delay Period than it would have experienced during the Government But-For Period. As a result, the government has failed to show a lack of a genuine issue of material fact regarding if government delays pushed Thalle's performance into a period of worse seasonal adverse weather delays than Thalle would have experienced but-for the delay.

## II. Affirmative Defenses

The government raises the affirmative defense of payment and accord and satisfaction (ASBCA No. 63734 answer at 7-8). The United States Court of Appeals for the Federal Circuit has held that release and accord and satisfaction are separate defenses. *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). It is the government's burden to prove defenses by a preponderance of the evidence. *See Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1360 (Fed. Cir. 2009); *Techni Data Laboratories*, ASBCA No. 21054, 77-2 BCA ¶ 12,667 at 61,410. As discussed below, there is a genuine issue of material fact as to whether the government can meet its burden of showing that the release or accord and satisfaction defenses apply.

## A. Release

There is a genuine issue of material fact as to whether the government can meet its burden of showing that the release defense applies. The release defense applies when there "is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Holland*, 621 F.3d at 1377. A "release is contractual in nature and must be interpreted in the same manner as any other contract term or provision." *Korte-Fusco Joint Venture*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,455 (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009)).

21

Here, Thalle points to the release in Modification No. P00017—under which "Thalle reserves the right to submit a claim for costs incurred due to adverse weather days between 03 November 2019 and 22 July 2020 unrelated to the left rim work that is the subject of this Modification" (ASBCA No. 63734 SOF ¶ 5). Thalle argues that we should focus upon that modification because it specifically reserved Thalle's right to bring a claim for weather delays during the Delay Period (app. opp'n at 31-33). The government points to the purported release in Modification No. P00009[15]—which allegedly discharged claims for all delays related to the change ordered without any reservation of rights (gov't mot. at 41-42). The government argues that we should focus upon that modification because it addressed the government delays that Thalle claims pushed its performance into a period of worse seasonal adverse weather (*id.*).

We need not resolve that dispute. Even focusing upon Modification No. P00009, the government would not be entitled to judgment as a matter of law because Modification No. P00009 does not contain the release language that the government alleges it contains. Modification No. P00009—which addressed both weather delay and the Berm Delay—merely stated that the increase in the contract time and the lack of change in the contract price "reflects all credits due the Government and all [debts] due the Contractor with the exception of the costs has not been agreed upon for" the Berm Delay (ASBCA No. 63734 SOF ¶ 4 (emphasis added)). While Modification No. P00009 also required Thalle to submit a proposal for modified pricing that included "all direct and indirect costs [and] any impacted costs" as a result of the Berm Delay, the government has not pointed to any evidence that Thalle submitted such a proposal, let alone that the parties agreed to release all claims regarding any such proposed costs (*id.*). Because Modification No. P00009 did not release any claims for increased costs regarding the alleged government-caused Berm Delay, the government has failed to show that it is entitled to summary judgment on its release affirmative defense to Thalle's claim that government delays pushed its performance into a period of worse seasonal adverse weather.

---

[15] The government actually points to all of the modifications besides P00017, but justifies that focus by asserting that those modifications account for the identified government delays (gov't mot. at 41-42). However, as discussed above, the complaint only identified the government delays accounted for by Modification No. P00009 (ASBCA No. 63734, compl. ¶¶ 11-14, 18). Therefore, we focus on the government's argument as it pertains to Modification No. P00009. If Thalle were to attempt to expand the government delays that allegedly pushed its performance into a period of worse seasonal adverse weather to include the government delays addressed in all of the modifications besides Modification No. P00017, then we would need to determine the effect of the releases in those other modifications, if any.

22

B. Accord and Satisfaction

There is a genuine issue of material fact as to whether the government has met its burden of showing that the accord and satisfaction defense applies. "Discharge of a claim by accord and satisfaction means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim." *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965) (quotation and citation omitted). The affirmative defense of accord and satisfaction requires four additional elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Holland*, 621 F.3d at 1382. For the reasons discussed above, namely, the ambiguity of what was covered by the releases, *cf. id.* at 1382-83 (settlement agreement used to demonstrate meeting of the minds), there is a genuine issue of material fact as to whether there was a meeting of the minds. Therefore, the government is not entitled to summary judgment on its accord and satisfaction affirmative defense.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment is granted in part, and denied in part. We dismiss ASBCA No. 63685 and strike the allegations that the government improperly required Thalle to import topsoil from ASBCA No. 63721.

Dated: August 13, 2025

_James R. Sweet_
JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

23

I concur                                          I concur

_____                   _____
OWEN C. WILSON                                     J. REID PROUTY
Administrative Judge                               Administrative Judge
Acting Chairman                                    Vice Chairman
Armed Services Board                               Armed Services Board
of Contract Appeals                                of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63685, 63719, 63720, 63721, 63734, Appeals of Thalle Construction Company, rendered in conformance with the Board's Charter.

Dated: August 13, 2025

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

24